# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Planned Parenthood South Atlantic, on behalf of itself, its patients, and its physicians and staff; Katherine Farris, M.D., on behalf of herself and her patients; Greenville Women's Clinic, on behalf of itself, its patients, and its physicians and staff; and Terry L. Buffkin, M.D., on behalf of himself and his patients, Respondents,

v.

State of South Carolina; Alan Wilson, in his official capacity as Attorney General of South Carolina; Edward Simmer, in his official capacity as Director of the South Carolina Department of Health and Environmental Control; Anne G. Cook, in her official capacity as President of the South Carolina Board of Medical Examiners; Stephen I. Schabel, in his official capacity as Vice President of the South Carolina Board of Medical Examiners; Ronald Januchowski, in his official capacity as Secretary of the South Carolina Board of Medical Examiners; George S. Dilts, in his official capacity as a Member of the South Carolina Board of Medical Examiners; Dion Franga, in his official capacity as a Member of the South Carolina Board of Medical Examiners; Richard Howell, in his official capacity as a Member of the South Carolina Board of Medical Examiners; Robert Kosciusko, in his official capacity as a Member of the South Carolina Board of Medical Examiners; Theresa Mills-Floyd, in her official capacity as a Member of the South Carolina Board of Medical Examiners; Jennifer R. Root, in her official capacity as a Member of the South Carolina Board of Medical Examiners; Christopher C. Wright, in his official capacity as a Member of the South Carolina Board of Medical Examiners; Samuel H. McNutt, in his official capacity as Chairperson of the South Carolina Board of Nursing; Sallie Beth Todd, in her official capacity as Vice

Chairperson of the South Carolina Board of Nursing; Tamara Day, in her official capacity as Secretary of the South Carolina Board of Nursing; Jonella Davis, in her official capacity as a Member of the South Carolina Board of Nursing; Kelli Garber, in her official capacity as a Member of the South Carolina Board of Nursing; Lindsey K. Mitcham, in her official capacity as a Member of the South Carolina Board of Nursing; Rebecca Morrison, in her official capacity as a Member of the South Carolina Board of Nursing; Kay Swisher, in her official capacity as a Member of the South Carolina Board of Nursing; Robert J. Wolff, in his official capacity as a Member of the South Carolina Board of Nursing; Scarlett A. Wilson, in her official capacity as Solicitor for South Carolina's 9th Judicial Circuit; Byron E. Gipson, in his official capacity as Solicitor for South Carolina's 5th Judicial Circuit; and William Walter Wilkins III, in his official capacity as Solicitor for South Carolina's 13th Judicial Circuit, Defendants,

and

Thomas C. Alexander, in his official capacity as President of the South Carolina Senate; G. Murrell Smith Jr., in his official capacity as Speaker of the South Carolina House of Representatives; and Henry McMaster, in his official capacity as Governor of the State of South Carolina, Intervenors-Defendants,

of whom Henry McMaster, in his official capacity as Governor of the State of South Carolina; G. Murrell Smith Jr., in his official capacity as Speaker of the South Carolina House of Representatives; Thomas C. Alexander, in his official capacity as President of the South Carolina Senate; State of South Carolina; and Alan Wilson, in his official capacity as Attorney General of South Carolina, are Petitioners.

Appellate Case No. 2023-000896

Opinion No. 28174
Heard June 27, 2023 – Filed August 23, 2023

**INJUNCTION VACATED AND ACT DECLARED CONSTITUTIONAL**

Chief Legal Counsel Thomas A. Limehouse Jr., Senior Litigation Counsel William Grayson Lambert, and Deputy Legal Counsel Erica Wells Shedd, all of Columbia, for Petitioner Governor Henry McMaster; Patrick Graham Dennis, of Columbia, for Petitioner G. Murrell Smith Jr.; Kenneth M. Moffitt, John Potter Hazzard V, and Jessica J Godwin, all of Columbia, for Petitioner Thomas C. Alexander; and Attorney General Alan McCrory Wilson, Solicitor General Robert D. Cook, Deputy Solicitor General J. Emory Smith Jr., Assistant Deputy Solicitor General Thomas Tyler Hydrick, and Assistant Deputy Solicitor General Joseph David Spate, all of Columbia, for Petitioners State of South Carolina; Attorney General Alan Wilson and Solicitor William Walter Wilkins, III.

M. Malissa Burnette, Kathleen McColl McDaniel, and Grant Burnette LeFever, all of Burnette Shutt & McDaniel, PA, of Columbia, for Respondents Planned Parenthood South Atlantic, Katherine Farris, M.D., Greenville Women's Clinic, and Terry Buffkin, M.D.; Catherine Peyton Humphreville and Kyla Eastling, both of New York, New York of Planned Parenthood Federation of America, for Respondents Planned Parenthood South Atlantic and Katherine Farris, M.D.; and Caroline Sacerdote and Jasmine Yunus, both of New York, New York of the Center for Reproductive Rights, for

Respondents Greenville Women's Clinic and Terry L. Buffkin, M.D.

Randall Scott Hiller of Randall S. Hiller, P.A., of Greenville; Kimberly A. Parker of Wilmer Cutler Pickering Hale and Dorr LLP, of Washington, D.C.; and Hannah E. Gelbort, of Wilmer Cutler Pickering Hale and Dorr LLP, of Boston, Massachusetts, for American College of Obstetricians and Gynecologists, American Medical Association, and Society for Maternal-Fetal Medicine Amici Curiae.

Christopher Ernest Mills, of Spero Law LLC, of Charleston for American College of Pediatricians; South Carolina Association of Pregnancy Care Centers and Daybreak Lifecare Center Amici Curiae.

Harmon L. Cooper, of Crowell & Moring LLP, of Chicago, Illinois for Women's Rights and Empowerment Network, (WREN), Able SC, Dr. Deborah Billings, Dr. Cara Delay, Dr. Bambi W. Gaddist, The Hive Community Circle, Palmetto State Abortion Fund, Jill Perry, and SisterSong Amici Curiae.

---

**JUSTICE KITTREDGE:** Earlier this year, a majority of this Court found unconstitutional the 2021 version of the Fetal Heartbeat and Protection from Abortion Act (the 2021 Act).[1] In response to our decision, the South Carolina General Assembly (the legislature) revised the 2021 Act, especially in terms of its legislative findings and purposes, and passed a new version of the Fetal Heartbeat and Protection from Abortion Act (the 2023 Act).[2] Immediately after the Governor signed the 2023 Act into law, Planned Parenthood South Atlantic and three other medical providers (collectively, Planned Parenthood) filed an action in the circuit court seeking a declaration that the new law is unconstitutional. Upon Planned

---

[1] *See Planned Parenthood S. Atl. v. State* (*Planned Parenthood I*), 438 S.C. 188, 882 S.E.2d 770 (2023); Act No. 1, 2021 S.C. Acts 2.

[2] Act No. 70, 2023 S.C. Acts ---, *codified at* S.C. Code Ann. §§ 44-41-610 to -740 (West 2023).

Parenthood's motion, the circuit court enjoined enforcement of the 2023 Act pending resolution of the constitutional challenge. Numerous state officials[3] (collectively, the State) promptly filed with this Court an emergency petition for supersedeas or, alternatively, a request that we accept the matter in our original jurisdiction and expedite briefing. We denied the petition for supersedeas but granted the alternative request to accept the matter in our original jurisdiction and expedite resolution of the case. For the reasons we explain below, we vacate the preliminary injunction issued by the circuit court and declare the 2023 Act constitutional.

## I.

We first acknowledge and confront the obvious: the subject of abortion is a highly contentious and divisive issue in our society. As United States Supreme Court Justice Brett Kavanaugh observed:

> Abortion is a profoundly difficult and contentious issue because it presents an irreconcilable conflict between the interests of a pregnant woman who seeks an abortion and the interests in protecting fetal life. The interests on both sides of the abortion issue are extraordinarily weighty.

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2304 (2022) (Kavanaugh, J., concurring). In fact, it was acknowledged decades ago that "[m]en and women of good conscience can disagree . . . about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 850 (1992), *overruled by Dobbs*, 142 S. Ct. at 2242, 2284.

We recognize the tendency of many to view the divisive issue of abortion through a lens shaped by their own politics or personal preferences. To be clear, our decision today is in no way intended to denigrate or exalt any of the valid concerns on either side of the abortion debate, whether those concerns are based in privacy, morality, medicine, religion, bodily autonomy, or something else. Rather, respectful of separation of powers principles and the limited (non-policy) role of the Court, we approach our solemn duty in this case with a single commitment: to honor the rule

---

[3] The State officials include, among others, the Governor of South Carolina, the President of the South Carolina Senate, the Speaker of the South Carolina House of Representatives, and the South Carolina Attorney General.

of law. In our constitutional framework, the rule of law does not bend to satisfy personal preferences.

## II.

The case before us is unique due to our recent decision in *Planned Parenthood I*. In that case, by a three-to-two vote (and in five separate writings), the 2021 Act was declared unconstitutional. While the three Justices in the majority reached the same conclusion, their reasoning varied significantly. Much of their relevant analysis centered on the scope of the search and seizure clause of the South Carolina Constitution, which contains a privacy provision. *See* S.C. Const. art. I, § 10 ("The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures *and unreasonable invasions of privacy* shall not be violated . . . ." (emphasis added)). Chief Justice Beatty and now-retired Justice Hearn were firmly in the camp of an expansive reading of the privacy provision in article I, section 10. *See Planned Parenthood I*, 438 S.C. at 199–210, 882 S.E.2d at 776–82 (Hearn, J.); *id.* at 229–39, 882 S.E.2d at 792–98 (Beatty, C.J., concurring). That expansive interpretation inured to the benefit of Planned Parenthood's position. *Id.* at 199–210, 882 S.E.2d at 776–82 (Hearn, J.); *id.* at 229–39, 882 S.E.2d at 792–98 (Beatty, C.J., concurring).

On the other hand, while Justice Few agreed with the ultimate result reached by Justices Beatty and Hearn, his reasoning was different. Justice Few pointed to what he believed were flaws in "the General Assembly's failure to consider the necessary factual question as a predicate to its policy judgment." *Id.* at 285, 882 S.E.2d at 822 (Few, J., concurring). After detailing his particular concerns, with a focus on the legislative findings and purposes of the 2021 Act, Justice Few determined the 2021 Act was unconstitutional as it violated article I, section 10 of the state constitution. *Id.* at 287–88, 290, 882 S.E.2d at 824, 825 (Few, J., concurring). However, importantly, Justice Few agreed with the two dissenting Justices that the South Carolina Constitution—whether in article I, section 10 or elsewhere—does not expressly provide a right to have an abortion. *Id.* at 287, 882 S.E.2d at 823 (Few, J., concurring).

On the heels of our decision in *Planned Parenthood I*, the General Assembly went back to the drawing board and drafted new legislation. It is unmistakable that the legislature focused on the alleged defects in the 2021 Act. The result was the passage of the 2023 Act.

The 2023 Act generally prohibits an abortion after the detection of a fetal heartbeat, not at a specified period of weeks into the pregnancy. *See* S.C. Code Ann. § 44-41-610(6) (defining the term "fetal heartbeat" as "cardiac activity, or the steady and repetitive rhythmic contraction of the fetal heart, within the gestational sac");[4] *id.* § 44-41-630(B) ("[N]o person shall perform or induce an abortion on a pregnant woman with the specific intent of causing or abetting an abortion if the unborn child's fetal heartbeat has been detected . . . ."). The law provides limited exceptions allowing for an abortion in the event of a risk to the health of the mother, fatal fetal anomalies, rape, and incest. *Id.* § 44-41-640 to -660.

It is apparent the South Carolina General Assembly carefully crafted the 2023 Act in an effort to demonstrate that its policy decision was not arbitrary. In particular, the legislature made a number of findings in support of its policy judgment. For example, the legislature explained the 2023 Act "took into consideration the interests of the pregnant woman and balanced them against the legitimate interest of the State to protect the life of the unborn," the latter interest of which the legislature characterized as "compelling." Citing its reliance on a number of experts in the field for a "scientific understanding of the development of the unborn early in pregnancy," the legislature concluded that "there is nothing arbitrary about banning abortions after a fetal heartbeat is detected with certain limited exceptions." Specifically, the legislature explained it had placed weight on the fact that a woman could learn of her pregnancy within seven to fourteen days of conception and would have several weeks after that to make her decision and have an abortion if she so chose. Thus, the legislature stated it had determined the "proper balance should be struck at the point of a fetal heartbeat," given the "ample" period of weeks a woman would have "to make a decision about whether to terminate her pregnancy." S. 474, S. Journal, 125th Leg. Sess., at --- (S.C. Feb. 9, 2023).

## III.

As an initial matter, we recognize that legislative findings are entitled to deference and may be rejected only if determined to be arbitrary as a matter of law. *See Richards v. City of Columbia*, 227 S.C. 538, 560, 88 S.E.2d 683, 694 (1955) ("Legislative findings of fact, while not binding upon the court, will not be

---

[4] We leave for another day (in an as-applied constitutional challenge) the meaning of "fetal heartbeat" and whether the statutory definition—"cardiac activity, *or* the steady and repetitive rhythmic contraction of the fetal heart, within the gestational sac"—refers to one period of time during a pregnancy or two separate periods of time. (Emphasis added.)

overturned except by convincing evidence to the contrary.").  This deference is not diminished simply because there is medical support for "both sides" of an issue.  *See Gonzales v. Carhart*, 550 U.S. 124, 161 (2007) (upholding the federal partial-birth abortion ban even where "[b]oth sides ha[d] medical support for their position").  In addition, a court should not turn its back on legislative deference merely because the issue is abortion, for "[m]edical uncertainty does not foreclose the exercise of legislative power in the abortion context any more than it does in other contexts." *Id.* at 164.

Moreover, three fundamental principles of law inform our analysis and provide the lens through which we examine Planned Parenthood's constitutional challenge to the 2023 Act.  First, the General Assembly's authority to legislate is plenary: the South Carolina Constitution grants power to the legislature to "enact any act it desires to pass, if such legislation is not expressly prohibited by the Constitution of this state, or the Constitution of the United States."  *Heslep v. State Highway Dep't*, 171 S.C. 186, 193, 171 S.E. 913, 915 (1933); *see also Hampton v. Haley*, 403 S.C. 395, 403, 743 S.E.2d 258, 262 (2013) ("[T]he General Assembly has plenary power over all legislative matters unless limited by some constitutional provision."); *Fripp v. Coburn*, 101 S.C. 312, 317, 85 S.E. 774, 775 (1915) ("[T]he Legislature may enact any law not prohibited by the Constitution.").[5]

Second, statutes are presumed constitutional.  That presumption is a weighty one and can be overcome only by a showing of unconstitutionality beyond a reasonable doubt.  *See Joytime Distribs. & Amusement Co. v. State*, 338 S.C. 634, 640, 528 S.E.2d 647, 650 (1999) ("A legislative enactment will be declared unconstitutional only when its invalidity appears so clearly as to leave no room for reasonable doubt that it violates a provision of the constitution."); *In re Care & Treatment of Griffin*, 434 S.C. 338, 341, 863 S.E.2d 346, 348 (Ct. App. 2021) (recognizing "beyond a reasonable doubt" as the highest possible burden of proof to satisfy).

Third, when issuing constitutional rulings, a court should endeavor to ground its decision on the narrowest possible basis.  *Wash. State Grange v. Wash. State Repub.*

---

[5] The plenary authority of the South Carolina General Assembly is more fully understood and appreciated when contrasted with the legislative authority of the United States Congress vis-à-vis the United States Constitution.  While the South Carolina Constitution allows our legislature to enact any law unless such law is expressly *prohibited* by the state or federal constitutions, the opposite holds true with respect to Congress—that is, Congress may act only if such authority is specifically *granted* by the United States Constitution.

*Party*, 552 U.S. 442, 450 (2008) ("Facial challenges . . . run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." (cleaned up)). This rule gains force when the constitutional challenge is to a statute on its face, rather than as applied. *Id.* at 449–50 ("In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases. . . . Exercising judicial restraint in a facial challenge frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy." (cleaned up)); *cf. Yazoo & Miss. Valley R.R. v. Jackson Vinegar Co.*, 226 U.S. 217, 220 (1912) ("How the state court may apply [a statute] to other cases, whether its general words may be treated as more or less restrained, and how far parts of it may be sustained if others fail[] are matters upon which we need not speculate now."). Here, Planned Parenthood alleges the 2023 Act is facially unconstitutional. With a facial challenge, Planned Parenthood must demonstrate the 2023 Act is unconstitutional "in all its applications." *Richardson ex rel. 15th Cir. Drug Enf't Unit v. $20,771.00 in U.S. Currency*, 437 S.C. 290, 297, 878 S.E.2d 868, 871 (2022); *State v. Legg*, 416 S.C. 9, 13–14, 785 S.E.2d 369, 371 (2016) ("A facial challenge is 'the most difficult to mount successfully,' as it requires the challenger show the legislation at issue is unconstitutional in all its applications." (alteration marks omitted) (quoting *City of L.A. v. Patel*, 576 U.S. 409, 415 (2015)). We therefore go no further than necessary in exploring the constitutionality of the 2023 Act and issuing our decision.

## IV.

A threshold argument of Planned Parenthood is that the decision in *Planned Parenthood I* controls our decision here. *See Kimble v. Marvel Ent., L.L.C.*, 576 U.S. 446, 455 (2015) (explaining generally the notion of stare decisis, or "the idea that today's Court should stand by yesterday's decisions"). While we acknowledge the importance of stare decisis when confronting a challenge to a prior decision, it has no application here, for the 2023 Act is materially different from the 2021 Act the majority declared unconstitutional in *Planned Parenthood I*. Specifically, the 2023 Act contains different findings and purposes from the 2021 Act. For example, in the 2023 Act, the legislature expressed its compelling interest to protect the lives of unborn children and, critically, deleted its prior reference to the hallmark feature of the 2021 Act: informed maternal choice. *See Planned Parenthood I*, 438 S.C. at 285, 285 n.63, 882 S.E.2d at 822, 822 n.63 (Few, J., concurring) (opining that "the

denial of meaningful choice to women [as codified in the 2021 version of the Fetal Heartbeat Act] arising from the [legislature's] arbitrary failure to even consider the extent to which that choice is denied is unreasonable," and, "[f]or this reason, [finding] the Fetal Heartbeat Act imposes an unreasonable invasion of privacy on pregnant women"). This new balance struck in the 2023 Act between the competing interests of the mother and unborn child was combined with the legislature's new focus on contraceptives and early pregnancy testing, as well as a repeal of the statutes that codified the *Roe v. Wade*[6] trimester framework.

As the legislature makes changes to a statutory scheme, reliance on stare decisis is diminished as it relates to the requirements of the prior statutory scheme. *See Kimble*, 576 U.S. at 458 (noting that when the statutory underpinnings of a court's prior decision have eroded over time, there is heightened justification for revisiting a prior decision based on the now-modified statutory scheme). Thus, the differences between the 2021 Act and the 2023 Act fully answer and compel a rejection of Planned Parenthood's reliance on stare decisis. Nevertheless, because Planned Parenthood relies almost exclusively on the doctrine of stare decisis based on the false premise that the 2021 and 2023 Acts are "identical in all material respects," we will briefly address additional reasons the doctrine does not preclude this Court from addressing the constitutionality of the 2023 Act.

We first note stare decisis "is not an inexorable command; rather, it is a principle of policy and not a mechanical formula of adherence to the latest decision." *Payne v. Tennessee*, 501 U.S. 808, 828 (1991) (internal quotation marks omitted) (quoting *Helvering v. Hallock*, 309 U.S. 106, 119 (1940)). Thus, the assertion of stare decisis does not automatically foreclose a court from reviewing a precedent to ensure it was correctly decided. "This is particularly true in constitutional cases, because in such cases correction through legislative action is practically impossible."[7] *Id.* In contrast, if a court's decision is instead tied to a statute, the legislature is free to overrule the decision through a new statutory enactment. That is why adherence to precedent—stare decisis—is at its zenith when a court decision is based on statutory construction and not the constitution. *See, e.g.*, *Kimble*, 576 U.S. at 456 ("What is more, *stare decisis* carries enhanced force when a decision . . . interprets a statute.

---

[6] 410 U.S. 113 (1973), *overruled by Dobbs*, 142 S. Ct. at 2242, 2284.

[7] *Roe* is an example. Once the United States Supreme Court discovered a right to abortion in the United States Constitution in the 1970s, neither Congress nor any state legislature had the authority to remove the "constitutional" right until the Supreme Court revisited the *Roe* decision in *Dobbs*.

Then, unlike in a constitutional case, critics of our ruling can take their objections across the street, and Congress can correct any mistake it sees."). However, again, when a court's ruling is constitutionally based—as was our decision in *Planned Parenthood I*—stare decisis has reduced force. *Payne*, 501 U.S. at 828.

Second, *Planned Parenthood I* is a highly fragmented decision with five separate opinions. *See McLeod v. Starnes*, 396 S.C. 647, 654, 723 S.E.2d 198, 202–03 (2012) ("[W]hen the court is asked to follow the line marked out by a single precedent case it is not at liberty to place its decision on the rule of stare decisis alone, without regard to the grounds on which the antecedent case was adjudicated. An original case could not possibly gain authority by a mere perfunctory following on the principle of stare decisis." (cleaned up)). On the critical issue concerning the meaning of the article I, section 10 privacy provision, there is a clear rejection of the view advanced by Planned Parenthood. *See Planned Parenthood I*, 438 S.C. at 259, 882 S.E.2d at 808 (Few, J., concurring) ("I do not concur in Justice Hearn's or Chief Justice Beatty's analysis of the article I, section 10 question . . . ."). More to the point, a majority of this Court rejected Planned Parenthood's position and held article I, section 10 does not expressly include a right to an abortion.

Third, in light of the fragmented decision in *Planned Parenthood I*, to construe *Planned Parenthood I* as forever binding precedent would impermissibly inhibit the General Assembly's plenary power to legislate. *See generally Hampton*, 403 S.C. at 403, 743 S.E.2d at 262; *Heslep*, 171 S.C. at 193, 171 S.E. at 915; *Fripp*, 101 S.C. at 317, 85 S.E. at 775. This point is closely related to our primary reason for not invoking stare decisis: the 2021 and 2023 Acts are not identical. The 2023 Act is new legislation overhauled and redrafted after the Court's rejection of the legislature's initial efforts in 2021. We must now address the constitutionality of the new legislative effort after the General Assembly implemented the guidance provided by this Court in *Planned Parenthood I*.

Accordingly, we consider the constitutionality of the 2023 Act today with respect for our prior decision in *Planned Parenthood I* but also with the knowledge that *Planned Parenthood I* does not dictate the constitutionality of the amended version of the Fetal Heartbeat and Protection from Abortion Act.

# V.

We now turn to Planned Parenthood's challenge to the constitutionality of the 2023 Act. All but one of Planned Parenthood's allegations may be summarily resolved.[8]

The difficult issue before us is Planned Parenthood's claim that the 2023 Act violates the article I, section 10 "unreasonable invasion of privacy" provision found in the South Carolina Constitution. The provision states, in its entirety:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures and *unreasonable invasions of privacy* shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation, and

---

[8] As to Planned Parenthood's arguments regarding due process, equal protection, vagueness, and collateral estoppel, we summarily reject them pursuant to Rule 220, SCACR, and the following authorities: *Dobbs*, 142 S. Ct. at 2248 (considering whether the right to obtain an abortion is protected by the Fourteenth Amendment's Due Process Clause and concluding that "the clear answer is that the Fourteenth Amendment does not protect the right to an abortion"); *R.L. Jordan Co. v. Boardman Petroleum, Inc.*, 338 S.C. 475, 477, 527 S.E.2d 763, 764 (2000) (per curiam) ("The modern rule [in evaluating substantive due process claims] gives great deference to legislative judgment on what is reasonable to promote the public welfare when reviewing . . . social welfare legislation. Legislation is not overturned unless the law has no rational relationship to any legitimate interest of government." (cleaned up)); *Dobbs*, 142 S. Ct. at 2245–46 (holding that "a State's regulation of abortion is not a sex-based classification [in violation of the Equal Protection Clause] and is thus not subject to the 'heightened scrutiny' that applies to such classifications"); *State v. Wright*, 349 S.C. 310, 313, 563 S.E.2d 311, 312 (2002) (finding equal protection is not implicated when a law "realistically reflects the fact that the sexes are not similarly situated in certain circumstances"); *Curtis v. State*, 345 S.C. 557, 572, 549 S.E.2d 591, 599 (2001) (explaining that "all the Constitution requires [in order for a statute to survive a vagueness challenge] is that the language convey sufficiently definite warnings as to the proscribed conduct when measured by common understanding and practices"); *Catawba Indian Nation v. State*, 407 S.C. 526, 538, 756 S.E.2d 900, 907 (2014) (finding collateral estoppel inapplicable when the matter resolved in the prior action was not the same as the matter asserted in the current action).

> particularly describing the place to be searched, the person or thing to be seized, and the information to be obtained.

S.C. Const. art. I, § 10 (emphasis added).

While we reaffirm our finding from *Planned Parenthood I* that there is no fundamental constitutional right to abortion under article I, section 10, we likewise decline to revisit the fragmented decision regarding the proper scope of the privacy provision. Rather, in the interest of unity, we will assume only for purposes of our analysis and decision today that the privacy provision reaches beyond the search and seizure context to include bodily autonomy.[9] Accordingly, we go no further today than referencing *Singleton v. State,* which held that the interests protected by the privacy clause extend to bodily autonomy and integrity. 313 S.C. 75, 88–89, 437 S.E.2d 53, 60–61 (1993) (quoting article I, section 10 of the South Carolina Constitution, and concluding that "the South Carolina Constitutional right of privacy would be violated if the State were to sanction forced medication solely to facilitate execution").

Nonetheless, in utilizing the broader reading of article I, section 10, we cannot focus merely on the single word "privacy" contained therein but must instead consider the actual wording of the entirety of the provision: "The right of the people to be secure in their persons . . . [from] *unreasonable* invasions of privacy shall not be violated." (Emphasis added.) When viewed in its full and proper context, it is undeniable that

---

[9] We make this assumption in favor of Planned Parenthood's position in an effort to reach the ultimate question in this case, the resolution of which all Justices in the majority agree. Specifically, the four members of this Court comprising the majority here have differing views of the threshold issues leading to the ultimate question regarding the propriety of the legislature's balancing of the interests of privacy and bodily autonomy for the pregnant woman and protecting the life developing in the womb. We elect not to address those threshold differences: for purposes of our analysis and decision today, we will cast aside a review of the history and relevance of the 1971 amendments to the state constitution that included the privacy provision, including the work of the West Committee. We have chosen this route for our analysis because, in the end, our threshold disagreements obscure the consensus among us. That is to say, regardless of our threshold disagreements, once the analysis reaches the balancing of the competing interests, all four Justices in the majority agree that while a close question is presented, the 2023 Act must be upheld.

the South Carolina Constitution does not create an absolute bar against all state action that infringes on a person's privacy.[10] Instead, the state constitution draws the line at unreasonable invasions of privacy. In keeping with the separation of powers, it is the legislature's prerogative to make policy decisions, and it is the Court's duty to evaluate only whether those policy decisions are indisputably repugnant to the federal or state constitutions. *See, e.g.*, *ArrowPointe Fed. Credit Union v. Bailey*, 438 S.C. 573, 580, 884 S.E.2d 506, 509 (2023) ("Determinations of public policy 'are chiefly within the province of the legislature, whose authority on these matters we must respect.'" (quoting *Fullbright v. Spinnnaker Resorts, Inc.*, 420 S.C. 265, 271, 802 S.E.2d 794, 797 (2017))); *Smith v. Tiffany*, 419 S.C. 548, 559, 799 S.E.2d 479, 485 (2017) ("The General Assembly in the Act struck the balance among competing policy concerns it deemed appropriate. . . . If our mission were simply to achieve equity on a case by case basis, we would not necessarily disagree with Appellants and the dissent. But wherever the balance is struck, one can easily imagine scenarios where the result may be inequitable. . . . In honoring separation of powers, we adhere to the principle that a court must not reject the legislature's policy determinations merely because the court may prefer what it believes is a more equitable result.").

The 2023 Act, with exceptions, bans abortion after the detection of a fetal heartbeat, as that term is defined by statute. Does the Act infringe on a woman's privacy interest? Are the concerns and challenges of Planned Parenthood worthy of this Court's profound respect and careful consideration? The answer to both questions is unequivocally "yes." To be sure, the 2023 Act infringes on a woman's right of privacy and bodily autonomy.[11]

---

[10] Of course, virtually every law operates in some manner to limit a person's privacy. *See, e.g.*, *Planned Parenthood I*, 438 S.C. at 297, 882 S.E.2d at 829 (Kittredge, J., dissenting) ("For example, no rational person would contend the State does not have the authority to enact laws criminalizing assault, rape, theft, child abuse, drug trafficking, and the like. In these and so many other areas, the power of the State to regulate and prohibit conduct is unquestioned. There is not the slightest prospect that a court would contravene the will of the people, as codified by their elected representatives, because the law amounts to an invasion of privacy.").

[11] We note the 2023 Act contains exceptions designed to protect the life and health of the mother, and in this facial challenge, we are not confronted with any plausible argument or concrete situation that suggests compliance with the Act poses significant or unconstitutional threats to a mother's life or health care, or that it will result in medical providers delaying necessary or life-saving health care to the

Even so, and despite our temporary acceptance of an expansive construction of the privacy provision in article I, section 10,[12] the constitutional question before us is not easily answered. The legislature has made a policy determination that, at a certain point in the pregnancy, a woman's interest in autonomy and privacy does not outweigh the interest of the unborn child to live. As a Court, unless we can say that the balance struck by the legislature was unreasonable as a matter of law, we must uphold the Act. As we acknowledged at the outset, many may strongly disagree with the balance struck by the legislature from a policy standpoint; others may strongly agree with the balance struck in the 2023 Act; and still others may believe the balance should be struck more stridently in favor of protecting the life of the unborn child. This Court, however, does not make policy determinations. The legislature makes policy decisions. This is a central feature of separation of powers. Through the legal and judicial lens under which we must operate, while mindful of the difficult and emotional issue before us, we cannot say *as a matter of law* that the 2023 Act is unreasonable and thus violates the state constitution. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 599 (2012) (Ginsburg, J., concurring) ("Whatever one thinks of the policy decision [the legislature] made, it was [the legislature's] prerogative to make it. Reviewed with appropriate deference, [that policy judgment] should survive measurement under the [Constitution]."); *Samson v. Greenville Hosp. Sys.*, 295 S.C. 359, 367, 368 S.E.2d 665, 669 (1988) (per curiam) ("[T]his Court will not sit as a super-legislature to judge the wisdom or desirability of legislative policy determinations." (cleaned up)); *Brennen v. S. Express Co.*, 106 S.C. 102, 116, 90 S.E. 402, 406 (1916) ("[S]o long as the [legislature's] exertion of power bears a reasonable relation to a legitimate purpose sought to be accomplished, the courts may not interfere. With the wisdom and policy of legislative enactments[,] they have no concern. Being forbidden by the Constitution to invade the legislative domain, they cannot substitute their judgment and discretion for that of the lawmakers."); *cf. United States v. Comstock*, 560 U.S.126, 143 (2010) (noting Congress was faced with two equally reasonable policy choices, and in selecting one of the choices over the other, Congress's decision necessarily satisfied "'review for means-end rationality,' *i.e.*, . . . satisfie[d] the Constitution's insistence that a federal statute represent a rational means for implementing a constitutional grant of legislative authority" (citation omitted)); *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) ("States are accorded wide latitude . . . under their police powers,

---

mother or unconstitutionally infringe upon their independent medical judgment.

[12] Again, we accept this expansive premise for purposes of our decision today only. *See supra* note 9.

and rational distinctions may be made with substantially less than mathematical exactitude."); *Blum v. Stenson*, 465 U.S. 886, 895–96 (1984) ("The policy arguments advanced in [opposition to the law passed by the legislature] should be addressed to Congress rather than to this Court.").

We think it is important to reiterate: we are constrained by the express language in the South Carolina Constitution that prohibits only "*unreasonable* invasions of privacy." *See* S.C. Const. art. I, § 10 (emphasis added). A reasonableness framework is required. The concept of reasonableness necessarily embraces a range of permissible policy options, not a narrow line in the sand. Of course, people may disagree in good faith with the balance struck by the legislature, but that disagreement in no manner renders unconstitutional the legislatively determined balance. As judges, our solemn duty is to uphold the rule of law; we must maintain judicial discipline, refrain from acting as a super-legislature, and respect the plenary authority of the South Carolina General Assembly. *Cf. Hampton*, 403 S.C. at 403, 743 S.E.2d at 262 (explaining the legislature may enact any law it desires unless *expressly prohibited* by the state constitution); *Heslep*, 171 S.C. at 193, 171 S.E. at 915 (same); *Fripp*, 101 S.C. at 317, 85 S.E. at 775 (same). Because the 2023 Act is within the zone of reasonable policy decisions rationally related to the State's interest in protecting the unborn, we are constrained to defer to the legislature's policy prerogative.

## VI.

In conclusion, the legislature has found that the State has a compelling interest in protecting the lives of unborn children. That finding is indisputable and one we must respect. The legislature has further determined, after vigorous debate and compromise, that its interest in protecting the unborn becomes actionable upon the detection of a fetal heartbeat via ultrasound by qualified medical personnel. It would be a rogue imposition of will by the judiciary for us to say that the legislature's determination is unreasonable as a matter of law—particularly on the record before us and in the specific context of a claim arising under the privacy provision in article I, section 10 of our state constitution.

As a result, our judicial role in this facial challenge to the 2023 Act has come to an end. The judiciary's role is to exercise our judgment as to whether the legislative weighing of competing interests was within the range of possible, reasonable choices rationally related to promoting the legislature's legitimate interests. Having concluded that it was, we consequently defer to the legislature's gauging of the profound, competing interests at stake. Accordingly, we vacate the preliminary injunction and hold the 2023 Act is constitutional.

**PRELIMINARY INJUNCTION VACATED AND THE 2023 ACT DECLARED CONSTITUTIONAL.**

**FEW, JAMES and HILL, JJ., concur. FEW, J., concurring in a separate opinion. BEATTY, C.J., dissenting in a separate opinion.**

**JUSTICE FEW:** Seven months ago, I voted to strike down the 2021 Fetal Heartbeat and Protection from Abortion Act because the General Assembly specifically recognized in the 2021 Act a woman's interest in making "an informed choice about whether to continue a pregnancy," yet banned essentially all abortions "without the General Assembly having made any inquiry as to whether a substantial percentage of women even know they are pregnant" in time to make such a choice. *Planned Parenthood S. Atl. v. State*, 438 S.C. 188, 274, 284, 882 S.E.2d 770, 816-17, 822 (2023) (*Planned Parenthood I*) (Few, J., concurring in result). I referred to this as the "key question" as to the constitutionality of the 2021 Act. 438 S.C. at 284, 882 S.E.2d at 822 (Few, J., concurring in result). The General Assembly's failure to address this key question; its failure to balance the very right it codified—"informed choice"—against the State's interest in regulating abortion rendered the 2021 Act arbitrary, and thus violated the article I, section 10 prohibition against unreasonable invasions of privacy. *See* 438 S.C. at 285, 882 S.E.2d at 822 (Few, J., concurring in result) (explaining "under article I, section 10, the denial of meaningful choice to women arising from the arbitrary failure to even consider the extent to which that choice is denied is unreasonable").

Planned Parenthood argues the 2023 Act is no different from the 2021 Act because both ban most abortions at same point in time—"cardiac activity, or the steady and repetitive rhythmic contraction of the fetal heart, within the gestational sac." Thus, Planned Parenthood argues simplistically, my vote should be the same as it was in *Planned Parenthood I*. The State argues, on the other hand, "In passing [the 2023 Act], the General Assembly expressly sought to address some of the concerns raised by members of this Court in *Planned Parenthood* [*I*]," Att'y General Br. 1, and, "The 2023 Act rectifies each of the three specific issues that Justice Few found with the 2021 Act," Governor's Br. 1. *See also* Att'y General Br. 8 ("In response to Justice Few's opinion in the *Planned Parenthood* [*I*] case, the General Assembly carefully crafted the 2023 Act to remove any reasonable doubt [the Act is constitutional] by ensuring that its provisions are not arbitrary by allowing women a meaningful opportunity to make a decision about terminating a pregnancy prior to the detection of a fetal heartbeat."). I find the 2023 Act is constitutional.

To be clear, I stand firmly by everything I wrote in *Planned Parenthood I*. While I agree wholeheartedly with Justice Kittredge's statement "the General Assembly's authority to legislate is plenary," that plenary power must be exercised according to law. When the General Assembly enacts legislation that violates the constitution, it has exceeded its "plenary" power. In *Planned Parenthood I* and in this case, the attorneys representing the State have sounded a constant drumbeat for the "separation of powers" mandated by article I, section 8 of the South Carolina

Constitution. In petitions for rehearing from our decision in *Planned Parenthood I*, as an extreme example, the attorneys literally argued the mere fact this Court overturned the 2021 Act is a violation of the separation of powers.

Respectfully, the Justices of this Court understand the separation of powers. Each Justice on the Court—then and now—embraces the constitutional requirement that we respect the General Assembly's plenary power to legislate. But the article I, section 8 separation of powers provision demands *mutual* respect. To the same extent this Court is constitutionally bound to respect plenary legislative power, the General Assembly is bound to respect the limited judicial power set forth in article V of the South Carolina Constitution. Under article V, this Court has two perfectly-consistent, solemn duties. We must uphold legislation when it is possible to find the legislation conforms to the constitution; we must strike down legislation when it clearly violates the constitution. *See Clarke v. S.C. Pub. Serv. Auth.*, 177 S.C. 427, 435, 181 S.E. 481, 484 (1935) ("A statute will, if possible, be construed so as to render it valid;" and "a legislative act will not be declared unconstitutional unless its repugnance to the Constitution is clear and beyond reasonable doubt;" and "every presumption will be made in favor of the constitutionality of a legislative enactment"); *Thomas v. Macklen*, 186 S.C. 290, 305, 195 S.E. 539, 545 (1938) ("[W]e are not unmindful that it is a grave matter to overturn, by judicial construction, an enactment of the General Assembly. All presumptions are in favor of the power of that body to enact the law. All considerations involving the wisdom, the policy, or the expediency of the act are addressed exclusively to that branch of the state government. . . . But when the unconstitutionality of an act is clear to this court, beyond a reasonable doubt, then it is its plain duty to say so.").

Ultimately, the General Assembly did not attempt to simply re-enact the same legislation, as Planned Parenthood argues. Rather, it amended the 2021 Act in what appears to be a sincere attempt to comply with the narrowest reading of this Court's ruling in *Planned Parenthood I*. The question now before the Court, therefore, is whether the attempt was successful; do the changes the General Assembly made from the 2021 Act to the 2023 Act make it possible for this Court to find the 2023 Act constitutional under article I, section 10, despite the fact the threshold for banning most abortions did not change.

Article I, section 10, provides, "The right of the people to be secure in their persons . . . against . . . unreasonable invasions of privacy shall not be violated . . . ." There are three steps in the analysis of an unconstitutional invasion of privacy claim under article I, section 10. First, the court must identify the State's interests underlying its action. When the claim is based on legislative action, as here, the court must identify the interests the General Assembly was pursuing on behalf of the State in enacting

the legislation.  Second, the court must identify the countervailing privacy interests implicated by the State's action.  Third, once the competing interests have been identified, the court must address whether any invasion of privacy is "unreasonable." *See Hooper v. Rockwell*, 334 S.C. 281, 293-95, 513 S.E.2d 358, 364-66 (1999) (explaining article I, section 10 privacy interests are "not absolute" but must be balanced against the State's interests).  An invasion of privacy that is reasonable in light of the State's interest is not a violation of article I, section 10.  *See S.C. Dep't of Soc. Servs. v. Gamble*, 337 S.C. 428, 434-35, 523 S.E.2d 477, 480 (Ct. App. 1999) (studying the constitutionality of a statute, reciting the competing interests, and finding the statute constitutional because, "The statute at issue balances these rights").  In the case of legislative action, the Court may find the General Assembly's chosen balance of those interests—as reflected in the legislation—to be a violation of article I, section 10 only when the Court determines the invasion of privacy is unreasonable as a matter of law.  In other words, if the General Assembly could fairly have determined the invasion of privacy was reasonable, this Court may not substitute its judgment on the question of reasonableness.

The 2023 Act recites the State's interest in regulating abortion differently than the 2021 Act, stating, "The State of South Carolina has a compelling interest from the outset of a woman's pregnancy in protecting the health of the woman and the life of the unborn child."   Act No. 70, 2023 S.C. Acts § 1(3).  The State argues this provision of the 2023 Act "does make explicit the General Assembly's expression of the State's interest in protecting life from conception." Governor's Br. 15.  The State continues, "The 2023 Act therefore represents a new, stronger expression of the State's interest since [*Planned Parenthood I*] was decided that goes directly to this personhood question . . . ." *Id.*

As each of the Justices explained in *Planned Parenthood I*, none of us discount the strength of the State's interest in regulating abortion; the interest is a powerful one.  However, I do not view this revised wording as a significant change in the State's interest, and I do not believe the newly-worded interest "goes directly to this personhood question."  *See* 438 S.C. at 272-73, 882 S.E.2d at 815-16 (Few, J., concurring in result) (explaining the potential significance of a "personhood" policy determination by the General Assembly).

I do believe, however, the changes in expression of the State's interest bring more fully into focus the basis for the State's use of "the steady and repetitive rhythmic contraction of the fetal heart" as the threshold beyond which most abortions may not be performed.  *See* Act No. 70, 2023 S.C. Acts § 2(6) (defining "fetal heartbeat" as "cardiac activity, or the steady and repetitive rhythmic contraction of the fetal heart, within the gestational sac").  In the 2021 Act, the General Assembly made extensive

findings as to the correlation between an unborn child reaching this threshold and an eventual live, healthy birth. Act No. 1, 2021 S.C. Acts 3. Those findings are essentially summarized in the 2023 Act as, "A fetal heartbeat is a key medical predictor that an unborn child will reach live birth." Act No. 70, 2023 S.C. Acts § 1(1).

The State argues the General Assembly's recognition of a "strong correlation between this [fetal heartbeat] and a live birth" supports the constitutionality of the Act. Governor's Br. 21 n.3. The State's argument is that by choosing this "biologically identifiable moment in time"—as the 2023 Act calls it—as the threshold for banning most abortions, the General Assembly chose to prohibit only those abortions most likely to terminate pregnancies that would otherwise result in a live birth. This is a sensible argument, not unlike a point the Supreme Court of the United States made in *Roe v. Wade* regarding viability. *See Roe v. Wade*, 410 U.S. 113, 163, 93 S. Ct. 705, 732, 35 L. Ed. 2d 147, 183 (1973) ("With respect to the State's important and legitimate interest in potential life, the 'compelling' point is at viability. This is so because the fetus then presumably has the capability of meaningful life outside the mother's womb. State regulation protective of fetal life after viability thus has both logical and biological justifications."), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. ___, 142 S. Ct. 2228, 213 L. Ed. 2d 545 (2022).[13]

The most obvious change from the 2021 Act to the 2023 Act relates to the second step in the analysis—identifying any countervailing interests. In particular, the General Assembly eliminated the statutory right to "informed choice." In the 2021 Act, the General Assembly included the following in the "legislative findings" section,

> The General Assembly hereby finds, according to contemporary medical research, . . . :
>
> . . .
>
> (8) in order to make an informed choice about whether to

---

[13] The State's point is not that a fetal heartbeat is a "logical and biological" indication of current "capability of meaningful life outside the mother's womb"—viability— but that the fetal heartbeat is a "logical and biological" indication that eventually this particular pregnancy is likely to result in a live birth.

> continue a pregnancy, a pregnant woman has a legitimate interest in knowing the likelihood of the human fetus surviving to full-term birth based upon the presence of a fetal heartbeat.

2021 S.C. Acts at 3.

When this Court evaluated the constitutionality of the 2021 Act, we balanced the State's interest in protecting unborn life against the statutory countervailing interest of "informed choice" *and* the privacy interests arising from article I, section 10. As there is no "informed choice" provision in the 2023 Act, the State's interest in protecting unborn life is now balanced against only the constitutional privacy interests.

The most impactful change from the 2021 Act to the 2023 Act is actually a category of changes that are designed to approach the idea of choice in terms of promoting active family planning. First, the 2023 Act encourages couples to avoid unwanted pregnancies by providing insured access to contraceptives. Section 5 of the Act requires, "All individual and group health insurance and health maintenance organization policies in this State shall include coverage for contraceptives." Similarly, section 11 of the Act requires, "The Public Employee Benefit Authority and the State Health Plan shall cover prescribed contraceptives for dependents" and "shall not apply patient cost sharing provisions to covered contraceptives." In other words, the 2023 Act requires insured contraceptives to almost all couples in South Carolina.[14]

---

[14] Planned Parenthood argues free contraceptives are already required under federal law. From my research, it appears Planned Parenthood is partially correct. Federal law requires insured contraceptives for all group medical insurance plans that are not "grandfathered," meaning, not in place before March 2010. This federal requirement appears to apply to approximately 85% of working-insured Americans. The 2023 Act, therefore, appears to guarantee insured contraceptives to the approximately 15% of working South Carolinians who do not already enjoy such a guarantee under federal law.

Second—as the Governor makes clear in his brief to this Court—the 2023 Act specifically permits "'emergency contraception,' such as Plan B,"[15,16] which is a contraceptive that can be administered after sexual intercourse. As with other forms of contraceptives, what the Governor is calling "emergency contraceptives" are guaranteed to be covered under the terms of the 2023 Act to almost all women in South Carolina who are insured under a group or individual plan.

The Attorney General addresses these two components of "family planning" in his brief:

> The timeline for a meaningful opportunity to make a decision begins prior to pregnancy. Women and men who engage in sexual intercourse are aware that pregnancy can result. It is that awareness that allows a woman to engage in family planning. A woman who does not want to become pregnant, or a woman who is undecided about pregnancy, has ample opportunity to make well-informed decisions concerning her reproductive health. Prior to sexual intercourse, a woman has a meaningful opportunity to consider contraceptives such as birth control pills or intrauterine devices. After sexual intercourse, she has up to five days to consider whether she wants to take an over-the-counter emergency contraceptive to prevent pregnancy.

---

[15] The Governor states, "All of this is in addition to the fact that women still have the option of 'emergency contraception,' such as Plan B. Plan B prevents ovulation, fertilization and implantation; it does not (like mifepristone) terminate a pregnancy if the implantation has occurred." Governor's Br. 20 n.2 (citations omitted).

[16] The 2023 Act permits this in two ways not present in the 2021 Act: (1) Section 2 of the Act, specifically amended subsection 44-41-640(E), provides it is not illegal to "use, sell, or administer a contraceptive measure." The term "contraceptive" is defined to include "a drug, device, or chemical that prevents ovulation." (2) The term "abortion" is defined as a "clinically diagnosable pregnancy." That term is defined as "the point in time when it is possible to determine that a woman is pregnant due to the detectable presence of human chorionic gonadotropin (hCG)." That point in time occurs after the time when a woman would use emergency contraception, such as Plan B.

Att'y General Br. 12 n.4.

The Attorney General then addresses a point this Court specifically introduced during *Planned Parenthood I*. During oral arguments and in my opinion in *Planned Parenthood I*, I questioned whether—as a predicate to understanding the percentage of women are denied choice—the more appropriate question should be "how many women *can* know they are pregnant in time to make an informed choice," rather than "how many women [*do*] know . . . ." *See Planned Parenthood I*, 438 S.C. at 281, 882 S.E.2d at 820 (Few, J., concurring in result) (describing the questions I put to counsel during oral argument as seeking information on "what the General Assembly knew when enacting the [2021 Act], what Planned Parenthood knew when it filed this lawsuit, and what medical and scientific research shows about the percentage of women who *cannot know* of their pregnancy in time to make an 'informed choice'" (emphasis added)); 438 S.C. at 278, 882 S.E.2d at 818 (Few, J., concurring in result) ("Whether a pregnant woman is given an opportunity to make a meaningful choice and whether the invasion of her privacy by restricting her opportunity for an abortion is unreasonable each depend on the answer to one particular factual question: *Can* a pregnant woman even know she is pregnant in time to engage in a meaningful decision-making process and—if her choice is to not continue the pregnancy—make the necessary arrangements to carry out an abortion?" (emphasis added)). The Attorney General argues:

> Her awareness of the possibility of pregnancy further affords her the opportunity to control her reproductive health after sexual intercourse by taking a common, over-the-counter pregnancy test to determine whether she is pregnant and make a decision concerning an abortion before a fetal heartbeat can be detected.

Att'y General Br. 12 n.4.

This third component of family planning was specifically taken up by the Senate during its debate of House amendments to the original Senate bill.

> The Senate's debate during consideration of S. 474 very clearly established that there is nothing arbitrary about banning abortions after a fetal heartbeat is detected with certain limited exceptions. In fact, we very clearly articulated the basis for making that determination and specifically addressed the fact that a pregnant woman can know within 10 to 14 days after conception whether she is pregnant. According to the Cleveland Clinic, as early as 10 days after conception (but within 14 days) a home pregnancy test will detect the presence of human

chorionic gonadstropin, a special hormone that developed only upon implantation. A blood test can confirm the presence of that hormone as early as 7 to 10 days after conception. According to the American Pregnancy Association the heartbeat of an unborn child can be detected between 6½ to 7 weeks of pregnancy though it is possible, though much less likely, that a heartbeat can be detected a week earlier -- about 5½ weeks. That means that a woman can find out that she is pregnant two weeks after conception and has another 4½ to 5 weeks[17] to make her decision and have an abortion. It is our reasoned judgement that a month is enough time for a pregnant woman to decide whether to have an abortion and undertake the procedure to follow through with her decision.

S. 474, S. Journal, 125th Leg. Sess., at ____ (S.C. Feb. 9, 2023).

While there are no specific written findings in the 2023 Act on this subject, the General Assembly clearly considered the question. This is, therefore, the type of finding we typically will imply to the General Assembly. *See Richards v. City of Columbia*, 227 S.C. 538, 561, 88 S.E.2d 683, 694 (1955) (stating it is "presumed from the mere passage of the act that there was a finding of such facts as were necessary to authorize the enactment"). This Court must presume, therefore, the General Assembly placed emphasis in enacting the 2023 Act on the responsibility of sexually-active couples to actively—rather than passively—seek out testing as to whether a pregnancy has resulted from their sexual activity.

This brings me to the balancing of the State's interests against the countervailing interest of privacy under article I, section 10. At the outset of this balancing, there are a couple of points to make clear. The first point is that abortion is different from any other context in which a person may enjoy privacy rights, because abortion ends the life of an unborn child. No matter how one may view this reality in their own political terms, the constitutional reality for evaluating whether a particular restriction on abortion is an "unreasonable" invasion of privacy is that our General Assembly has clearly and unambiguously set a public policy against abortion in this State. In *Planned Parenthood I*, the Justices disagreed sharply over whether abortion implicates privacy at all. In this case, the Justices in the majority all agree on this important point: to the extent restrictions on abortion do implicate privacy

---

[17] These numbers are incorrect, presumably because the calculations that led to them were based on the date of the last menstrual period rather than the date of fertilization. The correct numbers would be "2½ to 3 weeks."

interests under article I, section 10, the fact an abortion ends the life of an unborn child strongly influences the balancing of those privacy interests against the State's interest in regulating abortion. The relationship of privacy and choice to abortion is unique among all applications of the right to privacy because—when making the decision to have an abortion—the exercise of the right of privacy ends the life of an unborn child. In this respect, all the cases in which this Court has balanced privacy interests in the past are distinguishable—*Singleton v. State*, 313 S.C. 75, 437 S.E.2d 53 (1993), the most prominent example—because abortion is different.[18]

The second point is the balancing of the State's interests against privacy interests begins in the General Assembly. *Gamble*, 337 S.C. at 434-35, 523 S.E.2d at 480. In the 2023 Act, the General Assembly chose to approach privacy and choice in an active sense, not merely as a choice arising upon the passive learning of an unwanted pregnancy, but as an active family planning process that begins at the outset of a sexually-active relationship and continues all the way to the threshold of "the steady and repetitive rhythmic contraction of the fetal heart" beyond which no abortions may take place unless an exception applies.

With these points in mind, I cannot say the abortion restrictions included in the 2023 Act are an unreasonable invasion of privacy. First, the State's interest in protecting the lives of unborn children is clearly articulated in the 2023 Act. The elimination of the interest of "informed choice" from the 2021 Act leaves this interest in life—which includes the life and health of the mother—as the sole purpose of the 2023 Act. With this purpose stated more clearly and without the countervailing statutory interest of informed choice, the correlation between reaching the threshold of a fetal heartbeat and the likelihood of a live, healthy birth stands out more clearly as a reasonable standard by which to regulate most abortion. In addition, I find it quite significant the State approached the idea of choice in terms of promoting active family planning. Couples who do not want to bring a pregnancy to term and have a baby are enabled by the 2023 Act to make that choice before a pregnancy by the

---

[18] In *Singleton*, we held "the South Carolina Constitutional right of privacy would be violated if the State were to sanction forced medication solely to facilitate execution." 313 S.C. at 89, 437 S.E.2d at 61. I agree with Justice Kittredge when he stated, "If nothing else, *Singleton* and the other cases mentioning article I, section 10 are distinguishable because they did not involve an interest in protecting the life of an unborn child." *Planned Parenthood I*, 438 S.C. at 316 n.91, 882 S.E.2d at 839 n.91 (Kittredge, J., dissenting).

increased availability of contraceptives, and are encouraged through the use of Plan B and early pregnancy testing to meet the statutory deadline of "fetal heartbeat" in the event contraceptive measures are not effective.

I am certain many will find my analysis unsatisfying.  Constitutional analysis, however, is not a team sport.  I—and the other Justices of this Court—must remain mindful that the regulation of abortion is in the first instance a political question.  It is a legal question only to the extent that any restriction on abortion may clearly violate a specific constitutional provision.  The only constitutional provision at issue here is the article I, section 10 right of privacy.  Article I, section 10 does not forbid all invasions of privacy, but only "unreasonable" invasions.  My vote in *Planned Parenthood I* was based on the fact the General Assembly did not even consider what I then called the "key question."  For that reason, the 2021 Act was arbitrary and, thus, unreasonable.  In the 2023 Act, however, the General Assembly not only considered the key question, it changed the question—as it is absolutely entitled to do—to focus the attention of sexually-active couples in South Carolina on active family planning, thereby expanding the notion of choice to the period of time before fertilization, certainly before a couple passively learns of a pregnancy.  The abortion restrictions in the 2023 Act are reasonable.  I find the 2023 Act constitutional.

**CHIEF JUSTICE BEATTY:** I respectfully dissent.    On May 23, 2023, the South Carolina General Assembly passed Senate Bill 474, the "Fetal Heartbeat and Protection from Abortion Act," which became effective upon the Governor's signing on May 25, 2023. *See* Act No. 70, 2023 S.C. Acts ___ ("the 2023 Act") (codified as amended at S.C. Code Ann. §§ 44-41-610 to -690 (West 2023)). The 2023 Act replaces prior legislation with the same name, "Fetal Heartbeat and Protection from Abortion Act" ("the 2021 Act"), that was deemed unconstitutional by this Court on January 5, 2023 in *Planned Parenthood South Atlantic v. State*, 438 S.C. 188, 882 S.E.2d 770 (2023) (*Planned Parenthood*).

The 2023 Act effectively reinstated the 2021 Act's ban on abortion in South Carolina upon the detection of a "fetal heartbeat." This term was statutorily defined then—as it is again now in the 2023 Act—as "cardiac activity, or the steady and repetitive rhythmic contraction of the fetal heart, within the gestational sac."[19] Although neither act specifies the number of weeks of gestation that is targeted, each has been informally characterized as a "six-week ban" based on similarly worded legislation introduced in multiple jurisdictions following the decision of the United States Supreme Court in *Dobbs*,[20] which overruled nearly fifty years of federal precedent on abortion.

In *Planned Parenthood*, several members of the Court noted that medical professionals have classified six weeks of gestation as the embryonic stage of development, not fetal, and have stated the only "cardiac activity" that could potentially exist at this point is the nascent flickering of electrical impulses from a group of inchoate cells. A "fetal heart" that is capable of "contraction," as provided in the statutory language, does not exist until later in the pregnancy, when the chambers of the heart have fully developed. *See Planned Parenthood*, 438 S.C. at 196 n.2, 882 S.E.2d at 774 n.2 (Hearn, J.); *id.* at 222, 882 S.E.2d at 788 (Beatty, C.J., concurring). Thus, the title and content of the legislation are a misnomer if it is viewed as a six-week ban because the terminology is medically and scientifically inaccurate. As such, it is the quintessential example of political gaslighting; attempting to manipulate public opinion and control the reproductive health decisions of women by distorting reality.

---

[19] *Compare* S.C. Code Ann. § 44-41-610(6) (West 2023) (2023 version), *with* S.C. Code Ann. Ann. § 44-41-610(3) (Supp. 2022) (2021 version).

[20] *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) (overruling *Roe v. Wade*, 410 U.S. 113 (1973) and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992)).

I say "if" the 2023 Act is viewed as a six-week ban because the majority now states there is uncertainty about what the language even means. The majority purports to take this case in the Court's original jurisdiction which, in addition to its legal role, also makes this Court the designated fact-finder under Rule 245, SCACR. However, the majority undertook no factual review in this case (or in *Planned Parenthood*). Further, it does not resolve the anomaly appearing on the face of the legislation regarding the timing of the "fetal heartbeat" ban. Instead, it acknowledges the uncertainty in a footnote and then leaves this question of fundamental importance—the meaning of the legislation—"for another day." *See* Majority Op. at n.4 ("We leave for another day (in an as-applied constitutional challenge) the meaning of 'fetal heartbeat' and whether the statutory definition— 'cardiac activity, *or* the steady and repetitive rhythmic contraction of the fetal heart, within the gestational sac'—refers to one period of time during a pregnancy or two separate periods of time. (Emphasis added.)").[21]

This omission, however, leaves our state with no guidance as to the 2023 Act's reach. How can anyone know how to comply with the law—particularly where it carries the threat of criminal penalties—and how can lawyers advise their clients, in the absence of a determination of this key point? In addition to the right to privacy, Planned Parenthood has raised issues to this Court regarding, *inter alia*, the legislation's vagueness, as well as due process and equal protection violations. However, the majority has summarily disposed of all of these arguments, including vagueness, in a single footnote. *See* Majority Op. at n.8 ("As to Planned Parenthood's arguments regarding due process, equal protection, vagueness, and collateral estoppel, we summarily reject them pursuant to Rule 220, SCACR, and the following authorities," followed by string citations). This appears to be

---

[21] I question whether this is because it is also a threshold issue on which the majority could not agree, so "in the interest of unity," the majority postponed a decision on this problematic issue in order to reach its desired consensus. *See* Majority Op. at n.9 (noting "the four members of this Court comprising the majority here have differing views of the threshold issues leading to the ultimate question regarding the propriety of the legislature's balancing of the interests of privacy and bodily autonomy for the pregnant woman and protecting the life developing in the womb," but "[w]e elect not to address those threshold differences" because "the majority agree that while a close question is presented, the 2023 Act must be upheld").

inconsistent, however, with its earlier footnote stating the meaning of the statute (in other words, the statute's vagueness) is an issue "for another day."

Based on the discussions during oral argument, it appears the majority's reference to the possibility of cardiac activity beginning at two different points in a pregnancy might stem from the use of a comma after "cardiac activity" in the statutory language that defines "fetal heartbeat." *See* S.C. Code Ann. § 44-41-610(6) (West 2023) ("cardiac activity, or the steady and repetitive rhythmic contraction of the fetal heart"). I note, however, that the General Assembly has made three findings accompanying the 2023 Act, and the second finding provides additional clarification on the meaning of "cardiac activity":

> (2) Cardiac activity *begins* at a biologically identifiable *moment in time*, normally *when the fetal heart is formed* in the gestational sac.

South Carolina Fetal Heartbeat and Protection from Abortion Act, Act No. 70, 2023 S.C. Acts ___, ___ § 1(2) (emphasis added). In my view, this legislative finding confirms that "cardiac activity" begins at only one unique "moment in time," so it cannot begin at two alternative points in a pregnancy, as postulated by the majority.

In addition, because the second finding provides "cardiac activity" commences "when the fetal heart is formed," it confirms my view that "cardiac activity" exists when the four chambers of the heart are fully developed and capable of "rhythmic contraction." This is also consistent with the plain reading of the statutory language, which refers to "the steady and repetitive *rhythmic contraction* of the *fetal heart*." *See* S.C. Code Ann. § 44-41-610(6) (West 2023) (emphasis added). A "fetal heartbeat," therefore, certainly cannot exist at six weeks of gestation, as only a nascent cluster of cells that will eventually develop into a heart is present at that time.

With this understanding of the meaning of when "cardiac activity" begins (i.e., when a heartbeat is first detected from the formed chambers of the heart), I would be inclined to concur in upholding the constitutionality of the 2023 Act. I would agree to do so if a ban at that point would allow women to make an informed choice about whether to continue a pregnancy, in accordance with South Carolina's constitutional right to privacy and our Court's precedent.

Whether informed choice can exist, however, depends upon a critical factual determination as to when a fetal heart is actually formed.[22]  However, the majority noticeably did not explore this point, despite taking the unusual step of removing this topic (the validity of an abortion ban) from the circuit court and hearing it in this Court's original jurisdiction twice in one year.  Because the majority has elected to leave the determination of what the 2023 Act means "for another day," yet has, paradoxically, upheld its constitutionality, I must dissent.  Concluding the 2023 Act is valid while remaining silent as to its timing—and without clearly rejecting any implication that it is reinstating what is at least perceived to be, effectively, a six-week ban—is concerning to me, and the fear of political retribution in this matter is palpable.  Today's result will surely weigh heavily upon the public and our state's medical professionals, in light of the threat of criminal penalties placed upon practitioners and the serious harm that could occur to women who could be denied reproductive health care during this uncertainty.

The remainder of my dissent will focus on responding to the decision of the majority (including the concurrence) as written, along with my analysis that the 2023 Act and the 2021 Act must have the same meaning, given that their operative terms are basically identical.  Because the 2021 Act was deemed unconstitutional when viewed as a six-week ban, I would hold that the 2023 Act, enacted only four months after this Court's decision in *Planned Parenthood* with essentially the same terms, is unconstitutional under any reasonable analysis.

## I.  Overview

Turning to the issues discussed by the majority, I cannot help but observe at the start that it has taken the extraordinary step of disregarding this Court's precedent as it struggles to justify its legally inconsistent result.  This not only weakens the stability and reliance value of the law in this state, but ultimately undermines judicial independence and the integrity of the Court as an institution.

Earlier this year, the Court held the 2021 Act violated the right to privacy under article I, section 10 of the South Carolina Constitution.  In doing so, we noted

---

[22] In *Planned Parenthood*, I noted that some sources, such as the American College of Obstetricians and Gynecologists, have indicated that the chambers of the heart and a heartbeat develop when a fetus is at a gestation of seventeen to twenty weeks, and that at six weeks, a quarter-inch-long embryo has no detectable "heartbeat," as the "sound" heard is actually manufactured by the ultrasound machine itself.  *See Planned Parenthood*, 438 S.C. at 222, 882 S.E.2d at 788 (Beatty, C.J., concurring).

that many women do not even know they are pregnant at the earliest stage of potential "cardiac activity," assuming at that time that it could occur at six weeks of gestation, as this arguably appeared to be the State's targeted goal. The Court held this early threshold likely precludes many women from making an informed choice about their reproductive health and obtaining care within the statutory timeframe. *See, e.g.*, *Planned Parenthood*, 438 S.C. at 195, 882 S.E.2d at 774 (Hearn, J.) ("In 2021, the General Assembly passed the Act, which prohibits an abortion after around six weeks gestation. *See* S.C. Code Ann. § 44-41-680 (Supp. 2022). This is before many women—excluding those who are trying to become pregnant and are therefore closely monitoring their menstrual cycles—even know they are pregnant."); *id.* at 221–23, 882 S.E.2d at 788–89 (Beatty, C.J., concurring) ("The number of weeks of gestation is not specified in the law, but the parties indicate it is their understanding that the law was intended to target gestation of six weeks or more, based on the idea that nascent 'cardiac activity' emerges from a small cluster of cells at that time. . . . As medical experts have explained, at this early stage, a substantial number of women do not even know that they are pregnant, so there is no realistic opportunity to make a medical decision as to the (unknown) pregnancy at this point.").

Justice Few, the third member of the Court's majority in *Planned Parenthood*, found the 2021 Act was unconstitutional because the General Assembly did not even consider if women *could* make an informed choice about whether to continue a pregnancy. *See id.* at 278, 882 S.E.2d at 819 (Few, J., concurring in result) ("[*K*]*nowledge of a pregnancy is a predicate for informed choice*. . . . Thus, if a substantial percentage of pregnant women cannot know of their pregnancy in time to have meaningful discussions, engage in sufficient deliberation and prayer, and then make timely arrangements to carry out an abortion, then *I cannot envision a winning argument that meaningful choice exists or that the denial of that choice is not an unreasonable invasion of privacy*." (emphasis added)). He found this rendered the law arbitrary because, while informed choice was included in the General Assembly's findings accompanying the 2021 Act, more importantly, informed choice exists as an inherent component of the constitutional right to privacy. *See id.* at 276, 882 S.E.2d at 818 ("Although the Fetal Heartbeat Act recognizes the interest of 'informed choice,' *a woman's interest in choice is not dependent on this portion of the Act*. . . . The article I, section 10 right of privacy . . . includes choice." (emphasis added)).

While Justice Few stated he would refrain from formally reaching this point, he nevertheless conceded that it was "plainly obvious" that the timeframe allotted was inadequate, and he emphasized that six weeks of gestation as calculated under the 2021 Act was actually only four weeks post-conception. *See id.* (stating "it is

important to understand that under the six-week bill, a pregnant woman's choice must be made—and carried out—within *four* weeks of the time she becomes pregnant"); *see also id.* at 285–86, 882 S.E.2d at 823 ("[B]ecause the General Assembly did not consider the question, there is nothing for the Court to consider. I am nevertheless tempted to address whether there could be any evidence to support such a 'presumed finding' and find the Fetal Heartbeat Act in violation of article I, section 10 for the additional reason it is impossible for the General Assembly to reach any conclusion other than a substantial percentage of pregnant women cannot learn of their pregnancy, have time for sufficient deliberation and prayer, and if the choice is made to not continue the pregnancy, then carry out an abortion before the legality of doing so expires under the Act. *I am tempted for the obvious reason that it is plainly obvious a substantial percentage of women cannot learn of their pregnancy in time to make and carry out a meaningful choice under the Fetal Heartbeat Act.*" (emphasis added)).

In my view, because the material terms of the 2023 Act have not changed from the 2021 Act, logic and respect for the doctrine of stare decisis dictate that the 2023 Act should likewise be declared unconstitutional. To paraphrase legal scholars, the decisions of this Court represent the solemn determination of the Court as an entity, not its members, and this Court remains the same Court, even as its composition changes. As a result, the Court's decision rendered in January was not just a decision "for the time being." Rather, it was the considered determination of this Court after a lengthy deliberative process. This case presents the quintessential example of why stare decisis must be applied to uphold the integrity of the Judicial Branch's position as a separate, but co-equal branch of government.

After this Court's pronouncement, the invalidity of a six-week abortion ban was no longer an uncertainty in light of the state constitutional right to privacy, and the Court's decision became precedent in South Carolina. If the Court's decisions were subject to the vagaries of unending individual opinion, numerous points of "settled law" could be placed in turmoil from constant reexamination. For these reasons, stare decisis is a guiding principle that courts have used for centuries to bring stability to the law.

The majority and I agree about the separate functions of the three co-equal branches of government and this Court's role in reviewing the matter. Today, however, the majority has allowed the legislature to infringe upon this separation of powers by upholding the resurrection of a ban that this Court has already determined violates our state constitution. It does so by going to great lengths to reason "[t]he 2023 Act is new legislation" after "the General Assembly went back to the drawing

board."  It does so because it must.  Otherwise, its rejection of stare decisis falters.  If the acts are the same, our decision in *Planned Parenthood* must control.

Our analyses diverge at the outset because we disagree on whether the 2023 Act differs from the 2021 Act.  The majority points to changes the General Assembly made in its supporting findings and purposes, and to the availability of contraception as a tool for "family planning."  As will be explained, in my view, these points do not alter the material terms of the 2023 Act and their effect.  Both the 2021 Act and the 2023 Act—which bear the same name and ban abortion at exactly the same point in time—preclude many woman from being able to exercise informed choice over their reproductive health decisions because the prohibition takes effect before many women can realistically know that they are pregnant and obtain an abortion.  Further, I strongly disagree with the suggestion by the majority that the availability of contraception to *prevent* a pregnancy has any bearing on the amount of time a pregnant woman has to *discover* and decide whether *to continue* a pregnancy, and to obtain medical care based on that decision.  In my view, the notion that the existence of contraceptives expands the time for a woman to discover that she is pregnant is absurd.  I seriously doubt that the legislature intended contraceptives to be viewed in that context.

The ban that was declared unconstitutional by this Court just months before has not changed in its core elements or intended effect.  What has changed, however, is this Court's response.  What was once acknowledged in *Planned Parenthood* to be "plainly obvious"—that a ban at such an early stage of pregnancy can often leave women with no choice at all—is now suddenly constitutional.  The disregard of precedent and the reluctance to acknowledge what is still "plainly obvious" is unfortunate for the rule of law and, ultimately, the citizens of South Carolina, who must navigate the changing legal landscape that is controlling access to reproductive health care in this state.  It also undermines the separation of powers by failing to undertake this Court's obligation to evaluate whether the determinations of the General Assembly, once made, are reasonable.  I conclude, consistent with *Planned Parenthood*, that they are not, and the 2023 Act violates the constitutional right to privacy.

I am convinced of the appropriateness of my conclusion after considering (1) the doctrine of stare decisis, and (2) the inconsistency of today's result in view of the lack of change in the material terms of the 2023 Act and state precedent recognizing the right to privacy and bodily autonomy.  I will examine each of these points in turn.

## II.  Stare Decisis

"Stare decisis"—translated from Latin in the 18th Century as "to stand by things decided"—refers to "[t]he doctrine of precedent, under which a court must follow earlier judicial decisions when the same points arise again in litigation." *Stare Decisis*, *Black's Law Dictionary* (11th ed. 2019).  Thus, when a competent court decides a point, "it will no longer be considered as open to examination or to a new ruling by the same tribunal, or by those which are bound to follow its adjudications, unless it be for urgent reasons and in exceptional cases."  *Id.* (quoting William M. Lile et al., *Brief Making and the Use of Law Books* 321 (Roger W. Cooley & Charles Lesley Ames eds., 3d ed. 1914)).

This judicial principle predates the formation of the United States.  "The doctrine of stare decisis in American jurisprudence has its roots in eighteenth-century English common law."  Cong. Rsch. Serv., *ArtIII.S1.7.2.1 Historical Background on Stare Decisis Doctrine*, Constitution Annotated [hereinafter, Constitution Annotated], https://constitution.congress.gov/browse/essay/artIII-S1-5-1/ALDE_00001187/#ALDF_00021141 (last visited Aug. 14, 2023).  More than a century ago, this Court cited an example from English law that recognized the need for judicial consistency:

> Lord Kenyon, in *Schumann* [*v. Weatherhead* (1801), 1 East 537, 541 (U.K.)], said, "I should be sorry to see one decision in 1798, and a different decision on the same facts in 1801."

*Gage v. City of Charleston*, 3 S.C. 491, 497 (1872).

A fundamental aspect of stare decisis is that, not only should a court apply the law consistently in subsequent cases before the same members, but it should also apply the law consistently even as its own composition changes.  In 1912, Henry Campbell Black, the author of *Black's Law Dictionary* and other notable works, explained that a court's decision is not the view "for the time being," as the authority of a decision stems from the fact that it is the judgment of the court as an entity, and this fact does not change, even when its members do:

> For, when considered as a precedent, it is not an expression of the individual views of the judges *for the time being*, which their successors may or may not share,

> but *its authority is derived from the fact that it is the judgment of the court, which has not changed, though its members have*.

Henry Campbell Black, *Handbook on the Law of Judicial Precedents* 190 (1912) (emphasis added); *see also id.* at 189 ("Although the membership of a court may change from time to time, by the appointment or election of new judges in place of those who leave the bench, *yet it remains the same court*." (emphasis added)).

Once a court has announced its decision, the law on that point is no longer uncertain. 1 William Blackstone, *Commentaries on the Laws of England* 69 (1765). Accordingly, the determination—even a close one—should not thereafter "waver with every new judge's opinion" because a new judge is "sworn to determine, not according to his own private judgment, but according to the known laws and customs of the land; not delegated to pronounce a new law, but to maintain and expound the old one." *Id.*

A century ago, Judge (later Supreme Court Justice) Cardozo stated "adherence to precedent should be the rule and not the exception." Benjamin N. Cardozo, *The Nature of the Judicial Process* 148 (1921). He observed that "the labor of judges would be increased almost to the breaking point if every past decision could be reopened in every case, and one could not lay one's own course of bricks on the secure foundation of the courses laid by others who had gone before him." *Id.*

Despite the historical significance of this doctrine, today's majority resists the application of stare decisis based on its contentions the 2023 Act is completely new because the General Assembly has made statutory changes to remedy the constitutional defects present in the 2021 Act, the doctrine of stare decisis has less force in cases involving constitutional questions than in those involving statutory interpretation, and stare decisis cannot be applied based on only one case (i.e., *Planned Parenthood*).

As will be explored more fully in the next section examining the specific terms of the 2023 Act, I have no doubt that the 2023 Act is virtually identical in all material respects to the 2021 Act. This Court has previously held that it will not reconsider its precedent when there has been a later statutory change, but the substance of the statute is essentially the same, as the law should not be a "moving target." *See Wehle v. S.C. Ret. Sys.*, 363 S.C. 394, 402, 611 S.E.2d 240, 244 (2005). This reasoning should apply in the current matter because the 2023 Act has not fundamentally changed in its essential element—the imposition of a ban on abortion upon the detection of a "fetal heartbeat," as that term is statutorily defined.

To the extent the majority contends stare decisis has less force in constitutional cases, I note this position is, relatively speaking, a more recent expression of stare decisis that was created by the Supreme Court for the federal courts. It does not support a conclusion that stare decisis has *no* force in constitutional matters. It should also be of interest to advocates of originalism that this apparently was not the view of our nation's founders. The Congressional Research Service, which for over a hundred years has published a comprehensive, government-sanctioned record of the interpretations of the United States Constitution and provided research for Congress and the public, has indicated "the 'notion that the constitutional or statutory nature of a precedent affects its susceptibility to reversal *was largely rejected in the founding era* and did not gain majority support until well into the twentieth century.'" *See* Constitution Annotated, *supra*, *ArtIII.S1.7.2.2 Stare Decisis Generally* n.8 (emphasis added) (quoting Thomas R. Lee, *Stare Decisis in Historical Perspective: From the Founding Era to the Rehnquist Court*, 52 Vand. L. Rev. 647, 735 (1999)), https://constitution.congress.gov/browse/essay/artIII-S1-7-2-2/ALDE_00013237/#essay-8 (last visited Aug. 14, 2023).

In addition, it is notable that one of the earliest invocations of the sentiment by this Court (regarding the weaker force of stare decisis in constitutional cases) involved a departure from constitutional precedent *in order to expand upon*—not restrict—a personal liberty interest. For example, in a 1908 case this Court concluded stare decisis had less force because the challenged law "attempts to deprive the citizen of one of the personal rights guaranteed by the Constitution of the state":

> We shall not discuss at length the doctrine of stare decisis. It seems obvious it *has less force when the constitutional rights of the citizen to his personal liberty are involved than in those cases involving the fixedness of property rights and the regularity of procedure*. With the profoundest respect for the judges who delivered and concurred in these opinions, we cannot avoid the conclusion that the statute in question provides for imprisonment for debt without proof of fraud, and *therefore, attempts to deprive the citizen of one of the personal rights guaranteed by the Constitution of the state*.

*Ex parte Hollman*, 79 S.C. 9, 13–14, 60 S.E. 19, 21 (1908) (emphasis added).

The 2023 Act that is now before the Court involves the statutory *restriction* of a pregnant woman's right to make her own reproductive health decisions and have control over her own bodily integrity at an early stage of pregnancy. Accordingly, I believe stare decisis should carry great weight because its application would *prevent the deprivation of a personal right* guaranteed by the South Carolina Constitution— the right to privacy.

Stare decisis undoubtedly remains a foundational component of American jurisprudence to prevent arbitrariness and to ensure the steady and evenhanded application of the law. Despite the Supreme Court's overruling of federal abortion precedent in *Dobbs*, a researcher using data compiled by the Congressional Research Service has concluded "that the Supreme Court has overturned constitutional precedent in 0.005% of its decisions—an infinitely small or infrequent amount of the time." David Schultz, *Constitutional Precedent in US Supreme Court Reasoning* 22 (Edward Elgar Publishing 2022). This conclusion was based on comparing the over 26,000 judgments and opinions issued by the Supreme Court during its existence to the slightly over 140 Supreme Court decisions overruling its own *constitutional* precedent, as identified by the Congressional Research Service through 2018, which was then updated by the author (Schultz) through 2020. *Id.* at 21–22. Accordingly, it is clear that, for most of the Supreme Court's existence, it rarely rejected stare decisis in constitutional cases, having done so in *less than one-half of one percent of its cases* over more than two centuries.

The strength and value of stare decisis, even in constitutional cases involving abortion, was expressly reaffirmed by the Supreme Court's Chief Justice as recently as 2020 in a concurring opinion for *June Medical Services, L.L.C. v. Russo*, 140 S. Ct. 2103 (2020). Chief Justice Roberts noted that four years prior, he had dissented from an opinion, *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582 (2016), in which the majority concluded that a Texas law governing a physician's admitting privileges resulted in a substantial obstacle to women seeking an abortion and violated the Due Process Clause of the Fourteenth Amendment. The Chief Justice stated the Court was now faced with the same statute in Louisiana and was, consistent with precedent, likewise concluding the Louisiana statute was unconstitutional. The Chief Justice stated that, while he still stood by the views in his prior dissent, he was, nevertheless, voting to concur with the majority's determination in *Russo* to strike down the Louisiana statute based on the doctrine of stare decisis. In explaining his duty to uphold existing precedent, Justice Roberts stated:

> The legal doctrine of stare decisis requires us, absent special circumstances, to treat like cases alike. The Louisiana law imposes a burden on access to abortion just as severe as that imposed by the Texas law, for the same reasons. Therefore Louisiana's law cannot stand under our precedents.

*Russo*, 140 S. Ct. at 2134 (Roberts, C.J., concurring). *Russo* was ultimately one of the decisions abrogated by *Dobbs*. The abandonment of federal precedent by the Supreme Court in *Dobbs*, and the responses of some state legislatures and state courts, have had an enormous adverse impact on the reliance interests people have placed upon that precedent for nearly half a century. This includes not only pregnant women, but also their families and their doctors, as well as lawyers and state institutions.

In addition, federal courts rely upon a state court's determination of the constitutionality of a state statute, even if they have reached a different conclusion under federal law regarding similar provisions. *See Black's Handbook*, *supra*, at 552 ("The construction placed upon any clause or provision of the constitution of a state, by the highest court of that state, will be accepted as binding and conclusive by the federal courts, save only in so far as questions of federal law may be involved."). "It matters not that the federal courts have already reached entirely different conclusions in construing language of a similar or identical import in the federal constitution or laws." *Id.* at 553. "The final decision as to the meaning of the state constitution rests with the state courts." *Id.* Accordingly, the meaning of South Carolina's constitutional privacy clause rests solely with this Court. It is not controlled by the Supreme Court's decision in *Dobbs* or by any federal court.[23]

---

[23] In overruling *Roe*, the Supreme Court concluded the authority to regulate or prohibit abortion was being returned "*to the people* and their elected representatives." *Dobbs*, 142 U.S. at 2284 (emphasis added). In 2022, six states added ballot initiatives where "the people" could vote to either uphold or restrict access to reproductive care, including abortion. In all six states—California, Kansas, Kentucky, Michigan, Montana, and Vermont—the voters supported abortion access, either by approving measures that expressly recognized a constitutional right to abortion, or by rejecting proposals to constitutionally restrict the right to abortion. Additional states are planning similar ballot measures in 2023 and 2024. *See* Ballotpedia, *2023 and 2024 Abortion-Related Ballot Measures*, https://ballotpedia.org/2023_and_2024_abortion-related_ballot_measures (last visited Aug. 14, 2023). As of the date of this opinion in 2023, however, there are no

Lastly, I am not persuaded by the majority's contention that *Planned Parenthood* is a singular decision and this justifies the rejection of stare decisis, based on the Court's comments in the unrelated case of *McLeod*. *See McLeod v. Starnes*, 396 S.C. 647, 654, 723 S.E.2d 198, 203 (2012) (stating "stare decisis is far more a respect for a body of decisions as opposed to a single case standing alone"). While the majority focuses on the sentence quoted above, it is instructive that the *McLeod* Court further explained: "*That is not to say* that a single case garners no protection from stare decisis, *for even in those circumstances* we should hesitate to revisit and reverse our decisions without good cause to do so." *Id.* (emphasis added). Thus, a single decision is certainly precedential, and even one decision can be afforded respect under the doctrine of stare decisis. In fact, one of the cornerstone decisions of United States law, *Marbury v. Madison*, maintained its continuing influence under stare decisis despite the fact that it was, for many years, a single decision.[24]

In any event, the Court's determination that the state constitutional right to privacy extends beyond the search and seizure context and includes a person's right to bodily integrity and control over medical decisions is not a new concept limited to one decision, i.e., *Planned Parenthood*. It has been the law in this state for decades. For example, thirty years ago, in *Singleton v. State*, 313 S.C. 75, 89–90, 437 S.E.2d 53, 61–62 (1993), this Court recognized that an inmate has a constitutional right to privacy to be free from unwarranted medical intrusions, and we held the forced medication of an inmate to facilitate an execution would violate an inmate's right to privacy. In doing so, we agreed with the sentiment expressed by a Louisiana court that interpreted a similarly worded provision and concluded "the right to decide what is to be done medically with one's brain and body" was

---

plans for South Carolina voters to be given an opportunity to vote directly on the subject of abortion access, as envisioned in *Dobbs*.

[24] *See Marbury v. Madison*, 5 U.S. 137 (1803) (holding federal laws that conflict with the United States Constitution are invalid and establishing the principle of judicial review); *see also* Joseph Fawbush, *Marbury v. Madison Case Summary: What You Need to Know*, FindLaw, https://supreme.findlaw.com/supreme-court-insights/marbury-v--madison-case-summary--what-you-need-to-know.html#Impact (last visited Aug. 14, 2023) (noting *Marbury* became a cornerstone of United States law even though it was not actually cited by the Supreme Court for the principle of judicial review and used to strike down an unconstitutional law until many years later, in 1895).

encompassed in that state's constitutional right to privacy. *See id.* at 88, 437 S.E.2d at 60 (quoting *State v. Perry*, 610 So. 2d 746, 755 (La. 1992)).

In *Planned Parenthood*, this Court reiterated the holding in *Singleton* regarding the meaning of the right to privacy. *See, e.g.*, *Planned Parenthood*, 438 S.C. at 205, 882 S.E.2d at 779 (Hearn, J.) ("Respondents' position to limit the reach of the constitutional right to privacy to the criminal arena of search and seizure is also contrary to the jurisprudence of this Court. We have found that the right to privacy may be implicated in many ways, from requiring a witness to divulge medical information during a criminal trial to forcing a convicted felon to take medication so that he may be competent enough to be executed."); *id.* at 259, 882 S.E.2d at 808 (Few, J., concurring in result) ("The State argues our 'unreasonable invasions of privacy' provision should be limited to search and seizure cases and to electronic surveillance, and thus is inapplicable in this case. I disagree. . . . [T]he word 'privacy'—though broad—is clear as to its scope: it includes all forms of privacy. When a constitutional provision is clear, we must discern the intent behind the provision only from its text, and should not resort to other evidence of intent.").

Notably, today's majority also concludes the state constitutional right to privacy is not restricted to only a narrow class of search and seizure issues, so stare decisis is respected as to that particular point. However, the majority goes to great pains to search for explicit references to "abortion" in the state constitution and, finding none, declares the right to privacy cannot exist for a medical decision if it involves abortion. As this Court recognized decades ago, however, it is the general concept of "privacy" that is expressly guaranteed. The constitution does not list all subjects for which privacy is afforded, but how would this ever be possible? The constitution is a short document outlining broad concepts concerning the structure of state government. It serves as a general roadmap for future guidance and must be supplemented with other provisions, such as statutory laws and local ordinances. It does not provide the exhaustive detail of a tax code.

As the Court explained in *Planned Parenthood*, in reaching the decision in *Singleton*, the Court "did not ask whether our constitution specifically prohibited forced medication of an inmate in order to carry out an execution." *Planned Parenthood*, 438 S.C. at 206, 882 S.E.2d at 780 (Hearn, J.). We observed: "Just as the [privacy] provision does not specifically refer to abortion, neither does it mention forcing medication on an inmate." *Id.* In my view, the majority's discussion regarding its failure to "find" abortion in the constitution is specious. It is more a

function of the majority's desire to avoid the result in *Planned Parenthood* than a true analysis of the extent of privacy afforded by our state constitution.

Furthermore, for nearly fifty years, there has actually been two bodies of precedent that intersected on the issue of abortion, the law of this state and the law of the United States, both of which protected a woman's right to make an informed choice as to pregnancy. Significant reliance interests were placed on those bodies of precedent. Those interests have continued with this Court's decision in *Planned Parenthood* upholding, under state law, a woman's right to privacy and to control her own reproductive health decisions at the early stages of her pregnancy. Consequently, there is more than just a single decision on this topic, even if there is only one decision from this Court regarding the interplay of the state constitutional right to privacy and the 2021 Act. As previously noted, South Carolina's right to privacy is not affected by the outcome in *Dobbs*, as federal law is not controlling of our Court's determinations regarding a state constitutional right.

### III. The 2023 Act

I turn now to my last point of divergence from the majority—it is also the most crucial to my conclusion the 2023 Act is unconstitutional—my determination that the material terms of the 2023 Act are virtually identical to the those in the unconstitutional 2021 Act. For convenience, the material terms of the 2023 Act and the 2021 Act are outlined below:

| 2023 ACT | 2021 ACT |
|---|---|
| **The 2023 Act** prohibits an abortion upon a pregnant woman "if the unborn child's fetal heartbeat has been detected," with limited exceptions. S.C. Code Ann. § 44-41-630(B) (West 2023). | **The 2021 Act** prohibited an abortion upon a pregnant woman if a "fetal heartbeat has been detected" in a "human fetus," with limited exceptions. S.C. Code Ann. § 44-41-680(A) (Supp. 2022). |
| **"Unborn child"** is defined as "an individual organism of the species homo sapiens from conception until live birth." *Id.* § 44-41-610(14). | **"Human fetus"** or **"unborn child"** was defined as "each mean[ing] an individual organism of the species homo sapiens from fertilization until live birth." *Id.* § 44-41-610(6). |

| | |
|---|---|
| **"Conception"** is defined as the "fertilization of an ovum by sperm." *Id.* § 44-41-610(3). | **"Conception"** was defined as "fertilization." *Id.* § 44-41-610(1). |
| **"Fetal heartbeat"** is defined as "cardiac activity, or the steady and repetitive rhythmic contraction of the fetal heart, within the gestational sac." *Id.* § 44-41-610(6). | **"Fetal heartbeat"** was defined as "cardiac activity, or the steady and repetitive rhythmic contraction of the fetal heart, within the gestational sac." *Id.* § 44-41-610(3). |
| **"Gestational sac"** is defined as "the structure that comprises the extraembryonic membranes that envelop the unborn child and that is typically visible by ultrasound after the fourth week of pregnancy. *Id.* § 44-41-610(8). | **"Gestational sac"** was defined as "the structure that comprises the extraembryonic membranes that envelop the human fetus and that is typically visible by ultrasound after the fourth week of pregnancy. *Id.* § 44-41-610(5). |
| **"Gestational age"** is defined as "the age of an unborn child as calculated from the first day of the last menstrual period [LMP] of a pregnant woman." *Id.* § 44-41-610(7). | **"Gestational age"** was defined as "the age of an unborn human individual as calculated from the first day of the last menstrual period [LMP] of a pregnant woman." *Id.* § 44-41-610(4). |

As can be seen from the foregoing comparison, the material terms of the 2023 Act and the 2021 Act are virtually identical. They both impose an abortion ban upon the detection of "cardiac activity, or the steady and repetitive rhythmic contraction of the fetal heart, within the gestational sac." As discussed in this Court's decision finding the 2021 Act unconstitutional, although the number of weeks gestation is not specified, this operative provision has been variously described as a "fetal heartbeat" law (as appears in the title of the legislation) or, more informally, a six-week abortion ban (which has been the perceived effect). The premise of the legislation, however, is factually and medically inaccurate. A fetal heart has not yet developed at six weeks LMP and the organism is not yet a fetus; rather, it is classified as an embryo. When pregnancy is measured using the LMP date (as provided in the statutory

definition of "gestational age"), it is important to understand that this date is calculated from a point that is usually approximately two weeks *before* a woman is actually pregnant. As a result, six weeks LMP is only about four weeks of actual embryonic development, as the Court previously recognized in *Planned Parenthood*.[25]

Changes in the wording of other key terms of the 2021 Act are inconsequential. For example, although the majority emphasizes that the State now has an interest in an unborn child from *conception* because the 2023 Act defines an unborn child "from conception until live birth," whereas the 2021 Act referred to an unborn child "from fertilization until live birth," this is a distinction without a difference. Both the 2023 Act and the 2021 Act expressly define "conception" to mean the same as "fertilization." *Compare* S.C. Code Ann. § 44-41-610(3) (West 2023) (2023 version) *with* S.C. Code Ann. § 44-41-610(1) (Supp. 2022) (2021 version). As a result, any change in this regard is one of phrasing only, not meaning.

Essentially, the majority characterizes the 2023 Act as "new" legislation and maintains it is cured of any constitutional defect present in the 2021 Act because it contains different findings and purposes. For example, the 2023 Act does not include finding eight that accompanied the 2021 Act regarding "informed choice."[26] In *Planned Parenthood*, the Court observed that a six-week ban can deprive pregnant women of an opportunity to exercise "informed choice" because there is insufficient time to discover a pregnancy, assess and weigh the options, consult with a partner and family, decide whether to continue a pregnancy, schedule an appointment, comply with the statutory waiting period, and obtain an abortion. As several members of the Court specifically noted, this window is substantially shortened by the fact that all of these actions must actually occur within *four weeks* of conception,

---

[25] Planned Parenthood correctly points out that it is standard medical practice to date pregnancy using "gestational age," which is the number of weeks and days since the patient's LMP. Both the 2023 Act and the 2021 Act use LMP and "gestational age" in calculating the date of a pregnancy. Dating a pregnancy from LMP is distinguishable, however, from using the date of fertilization or conception. The LMP date is also distinguishable from the date of implantation, which is when a pregnancy actually begins from a medical point of view.

[26] *See* 2021 S.C. Acts 2, 3 § 2(8) (finding that, "in order to make an *informed choice* about whether to continue a pregnancy, a pregnant woman has a legitimate interest in knowing the likelihood of the human fetus surviving to full-term birth based upon the presence of a fetal heartbeat" (emphasis added)).

not six.  *See, e.g.*, *Planned Parenthood*, 438 S.C. at 222, 882 S.E.2d at 788 (Beatty, C.J., concurring) ("A pregnancy that is at six weeks gestational age (counted from the first date of the LMP) is actually at an embryonic age of only four weeks of development (counted from the date of conception).").

These circumstances have not changed since the opinion was published in January 2023.  Although the General Assembly has removed finding eight accompanying the 2021 Act—that women are entitled to make an "informed choice" about pregnancy—the removal of this collateral finding should not alter this Court's analysis or its ultimate conclusion.

As an initial matter, I note the majority's reasoning about "informed choice" is primarily directed at the first step in this judgment process, i.e., when a woman *can discover* she is pregnant.  As I will explain in the context of another point to follow, I disagree with its premise in this regard.  However, even if I agreed, this point would not cure the lack of informed choice that makes the timing of the ban unreasonable and, therefore, unconstitutional because the *discovery* of a pregnancy is just *one* of the many steps that necessarily must occur *before* six weeks LMP (or four weeks post-conception) elapses.

In addition, the legislative finding regarding "informed choice" was not actually codified as part of the 2021 Act, and the majority's result in *Planned Parenthood* was not based on this finding.  *See Planned Parenthood*, 438 S.C. at 274 n.56, 882 S.E.2d at 817 n.56 (Few, J., concurring in result) ("The legislative findings section of the 2021 six-week bill was not codified . . . .").  As Justice Few and the rest of the majority recognized, informed choice is not dependent on the legislative finding because it exists as an inherent factor in the constitutional right to privacy.  Consequently, the removal of the uncodified finding in the 2021 Act is not determinative.  *See id.* at 276, 882 S.E.2d at 818 ("Although the Fetal Heartbeat Act recognizes the interest of 'informed choice,' *a woman's interest in choice is not dependent on this portion of the Act.*  The choice of whether to continue a pregnancy or to have an abortion is an inherently private matter that implicates article I, section 10.  The General Assembly's codification [i.e., inclusion] of 'informed choice' as an interest to be valued here simply recognizes this obvious fact that abortion is a private choice.  *The article I, section 10 right of privacy, therefore, in this context, includes choice*." (emphasis added)).  I agree with Justice Few's original reasoning in this respect.  Bodily autonomy does not depend on the General Assembly's findings.  That protection is enshrined in the South Carolina Constitution.

Moreover, legislative findings are not law, and this Court may review them to determine if they are erroneous. *See generally Anderson v. Baehr*, 265 S.C. 153, 161, 217 S.E.2d 43, 46 (1975) (stating that, while legislative findings on an issue are entitled to weight, they are not conclusive); *Richards v. City of Columbia*, 227 S.C. 538, 560–61, 88 S.E.2d 683, 694 (1955) (stating legislative findings of fact are not binding on a court and are subject to judicial review, and a court may consider extrinsic evidence for this purpose, but a statute will not be held unconstitutional unless such legislative findings are clearly erroneous). *Cf. Redevelopment Comm'n of Greensboro v. Sec. Nat'l Bank of Greensboro*, 114 S.E.2d 688, 700 (N.C. 1960) (stating while legislative findings and declarations of policy are entitled to weight, they "have no magical quality to make valid that which is invalid, and are subject to judicial review").

The majority next relies on what it describes as the General Assembly's "new" and improved balancing of the interests of the pregnant woman and the embryo, along with a "new" focus on contraceptives for "family planning." In doing so, the majority asserts at the outset that the General Assembly "had placed weight on the fact that a woman could learn of her pregnancy within seven to fourteen days of conception and would have several weeks after that to make her decision and have an abortion if she so chose," relying not on any specific evidence or findings by the General Assembly, but on comments contained in the South Carolina Senate Journal regarding Senate Bill 474. In my view, the majority's acceptance of the General Assembly's belief that a woman can discover a pregnancy (and secure an abortion) within the statutory period is unreasonable, particularly where the General Assembly has made no actual findings in this regard and, to the extent the General Assembly has made what could be characterized as *implied* findings, they are inaccurate.

As the concurring opinion by Justice Few acknowledges, these are implied findings because they form no part of the 2023 Act. Further, although Justice Few has signed on to the majority's disposition, he also readily acknowledges that the implied findings relied on by the majority are incorrect. Justice Few quotes the General Assembly's comments reported in the Senate Journal ("That means that a woman can find out that she is pregnant two weeks after conception and has another 4 1/2 to 5 weeks to make her decision and have an abortion.") and notes: "These numbers are incorrect, presumably because the calculations that led to them were based on the date of the [LMP] rather than the date of fertilization." *See* Concurring Op. at n.17.

I agree with his assessment of the inaccuracy of the General Assembly's timeline, although I disagree with his conclusion that sufficient time nevertheless

exists for informed choice.  There is no factual data to support a determination that most women should learn of a pregnancy within seven to fourteen days of conception and would then have up to five weeks to decide whether to continue a pregnancy. The General Assembly's implied finding in this regard is neither accurate nor reasonable, and it presumes women should be constantly undertaking pregnancy testing throughout their reproductive years.  As discussed in *Planned Parenthood*, unless they are constantly testing themselves in an effort to *become* pregnant, many women do not even know they are pregnant until their menstrual cycle is late (which can be five weeks LMP or more).  Even women who are constantly monitoring their status in an effort to become pregnant are not usually keeping up this level of vigilance throughout the entirety of their reproductive years.  Rather, it is a specific endeavor that is normally undertaken over a much more defined time.  Blindly accepting an assertion that women should know they are pregnant within seven to fourteen days after conception imposes an inordinate financial and emotional burden on women to constantly test themselves, theoretically after any act of sexual intercourse, even before they have any objective indicia of a pregnancy.  It does not give any true consideration to balancing the interests of women when analyzing when they should be able to know of a pregnancy.

In addition, I note the State's arguments to this Court in support of the 2023 Act are based, at least in part, on the misapprehension of data from the South Carolina Department of Health and Environmental Control ("DHEC") regarding abortion rates.  This misapprehension stems from the fact that there are different methods for dating a pregnancy.  The 2023 Act, like the 2021 Act, uses LMP to calculate "gestational age."  As Justice Few explained in his concurrence in *Planned Parenthood*, the DHEC data reports the number of abortions beginning at six weeks *post-fertilization*, not six weeks LMP.  As a result, the DHEC data the State cites regarding abortion rates at "six weeks" is not at six weeks LMP.  Rather, it is the equivalent of *eight weeks LMP*—some two weeks later, and "approximately two weeks after the Fetal Heartbeat Act prevents an abortion."  *See Planned Parenthood*, 438 S.C. at 281, 882 S.E.2d at 820 (Few, J., concurring in result).  Thus, the conflation of gestational age based on LMP with age based on the date of fertilization leads to an almost impossible window for "informed choice" to occur in South Carolina.

This is also echoed in the reporting of the Centers for Disease Control and Prevention ("CDC"), which compiles abortion statistics.  Recent figures show that, in South Carolina, only 22.1 percent of abortions occurred by six weeks of gestation. *See* Table 10, *Abortion Surveillance -- United States, 2020*, CDC (Nov. 25, 2022), https://www.cdc.gov/mmwr/volumes/71/ss/pdfs/ss7110a1-H.pdf.      Accordingly,

existing data demonstrates the overwhelming majority of women (nearly eighty percent) in South Carolina historically have not been able to obtain an abortion within this very narrow timeframe.

To the extent the majority maintains a woman's access to birth control (including emergency contraception, i.e., "Plan B" pills) to *prevent* a pregnancy can somehow *increase the time* a woman has to know about a pregnancy and make an "informed choice" about *responding to a pregnancy*, I find the majority's adherence to this explanation to be not only illogical, but disingenuous. The majority holds the General Assembly accounted for "family planning" efforts in analyzing whether the time provided for informed choice in the 2023 Act was reasonable. Along these lines, Justice Few states in his concurring opinion that "[t]he most impactful change from the 2021 Act to the 2023 Act . . . [is] the idea of choice in terms of promoting active family planning." To support this "impactful change," Justice Few quotes portions of the Attorney General's brief that argue (1) "The timeline for a meaningful opportunity to make a decision begins prior to pregnancy," and (2) "Her awareness of the possibility of pregnancy further affords her the opportunity to control her reproductive health after sexual intercourse by taking a common, over-the-counter pregnancy test . . . ." Justice Few also opines that the General Assembly (and the State) have apparently changed the "key" question before the Court to now focus on family planning efforts to *prevent* a pregnancy as part of any constitutional analysis, and he indicates he approves this change in direction of the "key" question.

I disagree with the notion that the discussion surrounding "family planning" is a change that has *any* impact on the constitutionality of the 2023 Act. As I recall, Justice Few specifically acknowledged in *Planned Parenthood* that the constitutional right to privacy contains an inherent requirement of informed choice that is not dependent on the findings of the General Assembly, and the fundamental question before the Court was whether a woman has the ability to make an informed choice about "whether to continue a pregnancy." *See Planned Parenthood*, 438 S.C. at 276, 882 S.E.2d at 818 (Few, J., concurring in result) ("Although the Fetal Heartbeat Act recognizes the interest of 'informed choice,' a woman's interest in choice is not dependent on this portion of the Act. The choice of whether to continue a pregnancy or to have an abortion is an inherently private matter that implicates article I, section 10.").

That is still the question before this Court. While the General Assembly and the State are unquestionably entitled to change their arguments in support of the current legislation, that does not change this Court's focus on the issues that do impact whether the General Assembly's determinations are reasonable, as well as

ultimately whether the 2023 Act constitutes an unreasonable invasion of privacy. That being the case, how does the use of birth control have any bearing on *when* someone discovers an actual pregnancy and the time for deciding *whether to continue* a pregnancy? Any suggestion that the General Assembly can somehow alter the constitutional analysis of this Court simply by changing its assertions as to what it believes is reasonable is baseless.

The consideration of contraception illustrates how far afield the majority has gone in attempting to justify the impossible timeline that it advocates here. This Court has no factual information or record to justify the determination that the use of contraceptives *increases* the time to respond to a pregnancy. When we accepted original jurisdiction, we removed the case from the usual litigation process, and this Court has entertained no factual development of the record and instead relies on an unfounded and illogical premise.

Moreover, the implication is that women are solely responsible for a *couple's* unexpected pregnancy, possibly due to the lack of birth control. But what about situations where birth control fails? Or situations where someone does not have regular access to birth control due to circumstances beyond their control, such as a lack of insurance, low income, or an absence of nearby medical facilities? The financial and emotional burdens of repetitive pregnancy testing before a woman even has any reason to suspect a pregnancy, and the adverse effects from the use of hormonal contraceptives, such as Plan B, that are used before a woman can even know that she is pregnant (because it prevents implantation of the fertilized egg) are burdens that a woman will be forced to endure throughout her reproductive years. I believe the 2023 Act, by imposing its extreme deadline for compliance, fails to afford due consideration to these points when balancing the interests of women in this analysis.

In my view, the General Assembly's consideration of contraception and "family planning" clearly does not expand the time a woman has to decide whether *to continue* a pregnancy.[27] Further, the presence of birth control, as a general factor,

_____

[27] I believe it is arguable that the use of contraceptives could in some cases *shorten* the time available for a woman to discover a pregnancy. The use of contraceptives could falsely lull a woman into thinking there is a lessened likelihood of pregnancy, so she might not be as diligent with testing before she has any physical symptoms of a pregnancy. In addition, the use of some hormonal contraceptives can make women have variations in their menstrual cycles or in their fertility, which can interfere with both how quickly a woman can become pregnant and how quickly she may realize

existed at the time the 2021 Act was deemed unconstitutional, so it does not present a new or material change that would impact this Court's analysis regarding the right to privacy.

The majority rightly considers both the State's interests in regulating abortion and a pregnant woman's right to bodily autonomy. I agree that, "at a certain point in the pregnancy, a woman's interest in autonomy and privacy does not outweigh the interest of the [fetus] to live." Yet, because the material aspects of the two acts are the same, the line is drawn at exactly the same place—ostensibly, six weeks, or whenever a "fetal heartbeat" is detected. For this reason, the 2023 Act constitutes an unreasonable invasion of privacy. Our Court's role under Article V of the South Carolina Constitution does not require this Court to accept the findings or reasoning of the General Assembly as conclusive. In this case, the implied findings and policy choices of the General Assembly do not absolve the 2023 Act of its constitutional defects. Neither should the majority.

For all of the foregoing reasons, I firmly believe the State has shown no material differences in the key terms and the core application of the 2023 Act, and it suffers from the same infirmities that rendered the 2021 Act unconstitutional.

## IV. Conclusion

I agree with the majority that, "[a]s judges, our solemn duty is to uphold the rule of law." Today, however, the majority has abandoned the precedent established just months earlier by this Court and, despite its insistence otherwise, has turned a blind eye to the obvious fact that *the 2021 Act and the 2023 Act are the same.* The result will essentially force an untold number of affected women to give birth without their consent. I am hard-pressed to think of a greater governmental intrusion by a political body. This outcome is not an affirmation of the separation of powers, as the majority declares, but an abdication of this Court's duty to ascertain the constitutionality of the challenged legislation. Although today's decision has impaired our role as an independent and co-equal branch of government, I am confident that we will quickly return to the question again. The majority itself predicts this by noting it is leaving "for another day . . . the meaning of 'fetal heartbeat' and whether the statutory definition . . . refers to one period of time during a pregnancy or two separate periods of time." In the absence of this critical determination, I fail to see how the majority's result today is legally justifiable.

that she is pregnant compared to women whose cycles are regular.

While the majority makes much of the General Assembly's "plenary" power, I agree with the observation in the concurrence that, "[w]hen the General Assembly enacts legislation that violates the constitution, it has exceeded its 'plenary' power," and it is this Court's duty to say so. Unfortunately, this is such an instance.[28]

As previously noted, the fear of legislative reprisal is palpable. The lack of judicial independence renders a court powerless and places it on the edge of a slippery slope to irrelevance.

---

[28] Our system of government is not limited to elected officials. All South Carolinians have a continued role to play in these political and constitutional questions. That has not changed, and will not change, despite the Court's opinion today.